RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0138p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

STANLEY T. ADAMS,

　　　　　　*Petitioner-Appellant,*

　　*v.*　　　　　　　　　　　　　　　　　No. 07-3688

MARGARET BRADSHAW, Warden,

　　　　　　*Respondent-Appellee.*

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland
No. 05-01886—David A. Katz, District Judge.

Argued: October 7, 2015

Decided and Filed: June 13, 2016

Before: COLE, Chief Judge; SILER and WHITE, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Neil S. McElroy, Toledo, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Neil S. McElroy, Jeffrey J. Helmick, Toledo, Ohio, Spiros P. Cocoves, Toledo, Ohio, for Appellant. Thomas E. Madden, Jocelyn S. Kelly, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

─────────────────

**AMENDED OPINION**

─────────────────

SILER, Circuit Judge. Stanley T. Adams, an Ohio death row inmate, appeals the district court's order denying his petition for a writ of habeas corpus filed under 28 U.S.C. § 2254. We certified two claims for appellate review: (1) whether requiring Adams to wear a stun belt

throughout trial denied him a fundamentally fair trial; and (2) whether Ohio's lethal injection protocol violated the Eighth Amendment. We granted Adams's motion to hold the case in abeyance pending the resolution of *Glossip v. Gross*, 135 S. Ct. 2726 (2015), which was decided on June 29, 2015. For the following reasons, we **AFFIRM** the district court's denial of a writ of habeas corpus.

## FACTUAL BACKGROUND

### I.      State court proceedings

An Ohio jury convicted Adams of burglary, kidnapping, two counts of rape, and three counts of aggravated murder. Following the penalty phase, the trial court followed the jury's recommendation and sentenced Adams to death. On direct appeal, the Supreme Court of Ohio vacated Adams's kidnapping conviction and the related specifications, but affirmed the remaining convictions and the death sentence. *State v. Adams*, 817 N.E.2d 29, 59 (Ohio 2004).

In 2003, Adams filed a petition for post-conviction relief under Ohio Revised Code § 2953.21. The trial court denied the petition. The Court of Appeals of Ohio affirmed the decision. *State v. Adams*, No. 2003-T-0064, 2005 WL 238144, at *13 (Ohio Ct. App. Jan. 28, 2005). The Ohio Supreme Court declined further review. *State v. Adams*, 830 N.E.2d 346, 346 (Ohio 2005) (table).

### II.     Federal court proceedings

In 2006, Adams filed a petition for a writ of habeas corpus in federal district court, raising constitutional challenges both to the use of a stun belt during trial and to Ohio's lethal injection protocol as the third and fourth grounds for relief, respectively. In 2007, the district court denied the petition.

On appeal, we granted a Certificate of Appealability for the third and fourth claims of Adams's habeas corpus petition. *Adams v. Bradshaw*, No. 07-3688, slip op. at 4 (6th Cir. Nov. 9, 2007). In 2009, following final briefing but before oral argument, we granted Adams's motion both to stay the appellate proceedings and to remand his case to the district court to pursue the factual development of the fourth claim, Adams's constitutional challenge to Ohio's

lethal injection protocol. *Adams v. Bradshaw*, No. 07-3688, slip op. at 1 (6th Cir. Feb. 13, 2009). On remand, the district court rejected the warden's motion to dismiss Adams's lethal injection claim for lack of jurisdiction. On interlocutory appeal (case no. 10-4281), we affirmed the decision, reasoning that pursuant to *Hill v. McDonough*, 547 U.S. 573 (2006), and *Nelson v. Campbell*, 541 U.S. 637 (2004), "Adams's lethal-injection claim, if successful, could render his death sentence effectively invalid. Further, *Nelson*'s statement that 'method-of-execution challenges [ ] fall at the margins of habeas,' 541 U.S. at 646, strongly suggests that claims such as Adams's can be brought in habeas." *Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011) (alteration in original). We remanded the case to the district court.

In 2013, the district court indicated that it had complied with our requests set forth in the 2009 order of remand. Further, the court denied: (1) Adams's motions for additional discovery and to take judicial notice of another case, which involved a challenge to Ohio's lethal injection protocol brought pursuant to 42 U.S.C. § 1983 being litigated in federal district court in the Southern District of Ohio; and (2) the warden's motion for summary judgment.

## STANDARD OF REVIEW

A district court's grant or denial of a petition for a writ of habeas corpus is reviewed de novo. *Robins v. Fortner*, 698 F.3d 317, 328 (6th Cir. 2012). We review the district court's findings of fact for clear error and its legal conclusions on mixed questions of law and fact de novo. *Henderson v. Palmer*, 730 F.3d 554, 559 (6th Cir. 2013). Because Adams filed his habeas corpus petition in 2006, it is subject to the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which became effective on April 24, 1996. *Nali v. Phillips*, 681 F.3d 837, 840 (6th Cir. 2012) (citing *Woodford v. Garceau*, 538 U.S. 202, 210 (2003)). Under AEDPA, a writ may not be granted unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Under the 'contrary to' clause, § 2254(d)(1), 'a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" *Campbell v. Bradshaw*, 674 F.3d 578, 585 (6th Cir. 2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case." *Hodges v. Colson*, 727 F.3d 517, 525 (6th Cir. 2013) (quoting *Williams*, 529 U.S. at 413). "[T]he state court's factual findings are presumed correct unless rebutted by the habeas petitioner by clear and convincing evidence." *Id*. at 526 (citing 28 U.S.C. § 2254(e)(1)).

## DISCUSSION

### I.      Constitutional effect of the stun belt

We turn first to Adams's contention that the use of a stun belt throughout the jury trial deprived him of a fundamentally fair trial. Before the completion of jury selection, the trial court conducted a hearing concerning the use of a stun belt. The prosecution explained that its motion to use the stun belt in this case stemmed from Adams's recent convictions and sentencing for murder and rape in an unrelated case as well as Adams's statements to two mental health professionals indicating that he would attack his previous counsel if he saw them again. Further, the prosecution expressed concern about the emotional intensity of the crowd within the courtroom:

> I would note that the evidence in this case is going to have effects on a great deal of the participants. We have at least 15 representatives of the victim, or victims in this case, and a prior victim that family members indicate that they want to attend this trial. That - - considering the number of people that could be in this Courtroom and the emotional impact that aggravated murder would have on victims, that it is imperative that the Sheriff's Department feel comfortable that they can secure this for the public and the participants in a reasonable fashion. And so that is why we are here, the Sheriff's Department feels that they have the manpower to handle it, and they want to take all reasonable precautions to make sure that we have a safe and secure trial.

In response, trial counsel indicated that Adams's desire to attack his previous counsel should be of little concern, commenting that "as long as his attorneys are not in this room or within arms-length, then I don't think that we're going to have any problem, if that [is the] corner stone for the necessity of this disabling device." Trial counsel rejected the significance of the emotional impact upon the victims given the experience of the judge and both parties' counsel with similar circumstances, submitting that it did not warrant the use of "a harmful device." Trial counsel argued:

> [Adams] has an excellent jail record. He's never received an assignment in isolation, never been punished for his behavior in jail, and I think that if anything, without any foundation, the efforts of the Prosecutor are designed to create a setting to portray to a jury that there is some danger of risk or escape here.

> You know, we have four deputies here with guns. There is only one way out of this courtroom, and we have three deputies on both side[]s of the door that serves as an exit.

Trial counsel also expressed concern as to whether the stun belt would negatively impact Adams's epilepsy:

> One of the major reasons in addition to those that I have already mentioned, and the record has to be absolutely clear on this, [Adams] suffers from epileptic seizures since age 7. He is prescribed daily medication, twice daily for these epileptic seizures. I want to know what happens if somebody triggers this device, superimposed on his present neurological condition, do you - - can somebody foresee that it may cause him more harm than what will happen to a normal person?

In addition, trial counsel openly worried about how the presence of a stun belt would affect Adams's state of mind if someone triggered the stun belt during his testimony, if he decided to testify. Trial counsel also asked whether counsel would be affected if he was touching Adams during activation of the stun belt. Further, trial counsel questioned the approach taken by the security personnel:

> It[']s been my discussion with Mr. Watkins on a couple of occasions that I do believe that some of the deputies - - not some of the deputies, a deputy in charge of the security, quite an adequate personality, and I don't mean to be demeaning, but I think that under the circumstances has lost some objectivity. In sharing with him and discussing the issues on an academic level, I have come to learn that there is a thought that the Defendant is suicidal. I have seen them him [sic] deny

all comfort, except perhaps a glass of water. It's unique and almost humorous that they will not even let him sit in a chair that has wheels because they think that it will aid in [an] escape effort.

Trial counsel reiterated that he "would object to [the use of the stun belt] by virtue of the frame of mind that I think it will put the Defendant in, and what it will do to him."

Chief Ernie Cook of the Trumbull County Sheriff's Office addressed several of these concerns. He first indicated that the stun belt was a safer alternative than relying solely upon manpower: "When we think of alternatives when somebody is assaultive or that type of thing, what is four deputies jumping on somebody with night sticks, this alternative is safer than any other alternative." He addressed the circumstances by which the stun belt would be implemented, explaining that:

the only way this is going to be activated is if the Defendant embarks on an escape attempt, an assault, or other violent behavior. It is his decision if this device goes off, okay. It's non-lethal, it's short-term and it incapacitates. The alternative to that is a wrestling match, possible night sticks, injury there on maybe a permanent basis is a very big reality.

He explained the process by which the stun belt would be activated:

There also is in the training and everybody here, the deputies were certified in this, this is not - - you can't call back a bullet, but the presence of it is a deterrent. The next thing is verbalization. You can tell the Defendant, you know, to sit back down, do not attack the person, whatever. So, there is a second back-up there. The third one is, before this device goes off, there is an audible alert tone that actually tells the Defendant it's going to go off, so he's got some discretion on whether to pull back and quit his assaultive behavior or quit his escape attempt. And then the last one is activation.

Chief Cook noted that the use of the stun belt "has protected not only the suspect but also innocent bystanders and the officers, that is what the studies have come to be. And, again, we have used it in this state 62 counties out of 88, so I guess those are just some backgrounds on it. It gives us another option here." As to the possible impact upon a preexisting medical condition, Chief Cook testified that "a heart condition and muscular dystrophy were the only two that were listed" in the associated materials, though he noted that he was "not a physician, so I really can't answer." Chief Cook also explained that a person touching Adams when the stun belt was activated would not receive an electrical shock.

Chief Cook testified that the stun belt administered fifty thousand volts at four milliamps and had been tested on four volunteer employees, of whom only one suffered any ill effects, that being a "signature" mark on her arm, which is "just on the opposite of a burn mark." Chief Cook could not "certify" that a charge from the stun belt would not result in an epileptic seizure.

The reasons for recommending the use of the stun belt were discussed. Chief Cook acknowledged that he did not review Adams's jail records, but offered that Adams's "profile would put him at Level 4, which is the highest threat level for a prisoner Defendant." Deputy Darby Vaughn added the following:

> Mr. Macejko mentioned about the chair, and he mentioned about the wheel - - he mentioned about the straight leg. Well, the reason for the straight leg chair is so that he don't go back and forth and have freedom of movement. That is why he has a straight leg chair.

> On this right here, this apparatus, it's been proven by the FBI, it's all been - - they use it for many of their cases, they state it in the book. The Federal government, the U.S. Marshals are using it for transporting, and for their criminal activities for some people. Major Davis and Ernie Cook state that he's a Level 4. If you take a Level 4 in any penitentiary, it's not saying what he's going to do, but it's saying what he might do, and that is the reason for a Level 4 in our jail today.

The trial court concluded that Adams should wear the stun belt, offering the following reasoning:

> All right, having heard this information and this is the Court's view on this; Number 1, on the initial issue of what appearance it might be with the jury, it is my understanding from using this device that it's no more visible, no more intrusive than a device used in Mahoning County which is some kind of device that makes it difficult to lock the knee or something when they're walking. It's not visible when wearing clothing, it's not a shackle of any kind that is [visible] to a jury. So, I am not convinced that wearing that underneath his clothing is going to pose any problem.

> The secondary issue, all of the potential things that could happen in terms of leaving a mark, causing a seizure, incidental touching of a second person, are all things that come to play, if and only if that mechanism is triggered and not in any other fashion. It's my suggestion to you that I am going to assume that there isn't going to be nothing out of the ordinary that is going to happen in this case regardless of what is used. But I can assure you that if somehow there is something that happened out of the ordinary, the marks that may come into play,

in some kind of assaultive behavior or an effort to escape, are going to be significantly more than the signature marks of this device.

So, for those reasons, I don't find anything inappropriate about its use in this case. It does absolutely zero harm when not in use and the information that I have is, other than some initial debilitating and some kind of signature mark that is left on the affected area, it has no permanent damage as well and, like I said, I don't expect to have any problems, and I think this device goes towards that end. So, it's the opinion of this Court that it's appropriate to use that device during the remainder of this trial.

Responding to trial counsel's inquiry, the trial court stated that three deputies would remain in the courtroom. Trial counsel objected, arguing that the deputies' presence "takes away the presumption of innocence in this case. We have three deputies literally within six feet of him. At some point during this voir dire, we have seven deputies in this courtroom, and there is not that many lay people in this Courtroom." The court explained that "generally, there are either four or five [deputies] that are in here," and overruled the objection.

In its written order, the trial court noted that "[t]he Defendant's history as a violent offender awaiting transport to the Lorain Correctional Institution on a life sentence for murder and rape requires the use of extraordinary security precautions in the courtroom." The trial court explained that in the course of conducting a competency evaluation of Adams, two mental health experts—Douglas C. Darnall, Ph.D., and Steven J. Zuchowski, M.D.—had expressed concern about Adams's ability to control his behavior during trial. Dr. Darnall stated that Adams "may at times have difficulty in adequately controlling his frustration and anger. He was adamant in his desire to physically assault his previous attorney. I would not take that threat lightly." In his report, Dr. Zuchowski stated:

There is no indication that Mr. Adams would demonstrate unmanageable behavior in the courtroom. However, his personality traits, particularly impulsivity and irritability, make courtroom outbursts a possibility. It is my opinion with reasonable medical certainty that these outbursts would be under voluntary control and do not render him incompetent to stand trial.

Adams contends that the trial court's decision to require him to wear a stun belt throughout trial denied him a fundamentally fair trial. He raised this claim as the twelfth proposition of law on direct appeal. The Ohio Supreme Court determined that the trial court did

not abuse its discretion because the trial record reflected a factual basis for the decision, as the stun belt: (1) inflicted no harm when not activated and would not exacerbate Adams's epileptic condition; (2) would remain unknown to the jury as it was to be worn under the clothes and would not impair Adams's ability to assist trial counsel; and (3) was necessary because Adams had a violent criminal history, had threatened bodily harm to previous counsel, and posed a risk for escape according to reports from the jail. *Adams*, 817 N.E.2d at 53-54.

Rejecting Adams's claim, the district court reiterated the factors upon which the state supreme court relied to determine that the implementation of a stun belt "was the least of any potentially prejudicial, but adequate means of providing courtroom security." *Adams v. Bradshaw*, 484 F. Supp. 2d 753, 785 (N.D. Ohio 2007). The district court also concluded that if a due process error had occurred, it was harmless as there was overwhelming evidence of Adams's guilt. *Id.* at 786.

### b. Physical-restraints law

The Supreme Court has explained the limited role of a federal court examining a challenge to extraordinary measures undertaken during a criminal trial:

> All a federal court may do in such a situation is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

*Holbrook v. Flynn*, 475 U.S. 560, 572 (1986) (addressing whether, in addition to regular courtroom security, the presence of four uniformed state troopers sitting in the first row of the spectators' section at the trial of petitioner and five codefendants denied petitioner his right to a fair trial).

Adams relies upon three Supreme Court decisions to demonstrate the "clearly established Federal law" required for relief under AEDPA. He first points to *Illinois v. Allen*, 397 U.S. 337 (1970), in which the trial court ordered an armed-robbery defendant removed from the courtroom during voir dire and the majority of the state's case after the defendant made "abusive remarks" and refused to allow the trial to proceed. *Id.* at 340. The jury convicted the defendant, and the

Illinois Supreme Court affirmed on direct appeal. *People v. Allen*, 226 N.E.2d 1, 4 (Ill. 1967). The defendant petitioned for a writ of habeas corpus; he argued that his removal from the courtroom violated his Sixth Amendment right to be present at trial. *Allen*, 397 U.S. at 338. The Seventh Circuit held that the defendant should have been shackled and gagged rather than removed from the courtroom. *Id.* at 342; *see United States ex rel. Allen v. Illinois*, 413 F.2d 232, 235 (7th Cir. 1969).

The Supreme Court reversed, explaining that a defendant can lose his right to be present at trial if he is "so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Allen*, 397 U.S. at 343. The Supreme Court rejected the Seventh Circuit's ruling that shackling would be preferable, holding instead that "[N]o person should be tried while shackled and gagged except as a last resort." *Id.* at 344. The Court noted the possibility that shackles "might have a significant effect on the jury's feelings about the defendant," that "the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings," and that the defendant's "ability to communicate with his counsel[] is greatly reduced when the defendant is in a condition of total physical restraint." *Id.* But, the Court noted, "in some situations . . . binding and gagging might possibly be the fairest and most reasonable way to handle a [disruptive] defendant." *Id.*

Adams also relies upon *Holbrook v. Flynn*, 475 U.S. 560 (1986), in which six codefendants were tried for armed robbery. At voir dire, four state troopers sat in the front row of the courtroom's spectator section to provide security, and defense counsel objected that their presence would prejudice the defendants. *Id.* at 562-63. The trial court held a hearing on security measures and found that the six codefendants posed risks justifying the troopers' presence. *Id.* at 563, 565. The uniformed troopers remained throughout the trial, and the jury convicted three of the six codefendants. *Id* at 565. The Rhode Island Supreme Court affirmed on direct review. *State v. Byrnes*, 433 A.2d 658, 679 (R.I. 1981). One of the convicted defendants petitioned for a writ of habeas corpus in federal court, arguing that he was denied due process because of the prejudicial security measures. *Holbrook*, 475 U.S. at 566. The First Circuit agreed and ordered the writ granted. *Flynn v. Holbrook,* 749 F.2d 961, 967 (1st Cir. 1984).

The Supreme Court reversed.  The Court held that the presence of the four state troopers was not so inherently prejudicial that the petitioner was denied his right to a fair trial.  *Holbrook*, 475 U.S. at 570, 572.  Reviewing *Illinois v. Allen*'s discussion of shackling, the Court noted that shackling is "inherently prejudicial" and "should be permitted only where justified by an essential state interest specific to each trial."  *Id.* at 568-69.  The Court noted that shackling is an "unmistakable indication[] of the need to separate a defendant from the community at large."  *Id.* By contrast, the four officers did not create "an unacceptable risk of prejudice" because their presence did not "tend[] to brand [the defendants] in [the jurors'] eyes 'with an unmistakable mark of guilt.'"  *Id.* at 571-72 (quoting *Estelle v. Williams*, 425 U.S. 501, 518 (1976) (Brennan, J., dissenting)).  Even if their presence was prejudicial, "sufficient cause for this level of security could be found in the State's need to maintain custody over defendants who had been denied bail after an individualized determination."  *Id.* at 571.  The use of the troopers was "intimately related to the State's legitimate interest in maintaining custody."  *Id.* at 572.

Finally, Adams relies upon *Deck v. Missouri*, 544 U.S. 622 (2005).  In *Deck*, Missouri authorities required a defendant to wear a leg brace during his trial for murder and robbery.  *Id.* at 624.  On direct review, the Missouri Supreme Court upheld his conviction but vacated his death sentence.  *Deck v. State*, 68 S.W.3d 418, 432 (Mo. 2002) (en banc).  At the new sentencing proceeding, the defendant wore leg irons, handcuffs, and a belly chain.  Defense counsel objected before, during, and after voir dire.  *Deck*, 544 U.S. at 625.  The trial court overruled the objections, and the defendant was again sentenced to death.  *Id.*  On appeal, the defendant argued that the shackles violated his federal due process rights, but the Missouri Supreme Court affirmed the sentence.  *State v. Deck*, 136 S.W.3d 481, 490 (Mo. 2004) (en banc).

The United States Supreme Court reversed.  Reviewing the history of shackling, the Court noted that "[t]he law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." *Deck*, 544 U.S. at 626.  The Court concluded,

> [T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have

traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Id*. at 629. Addressing the defendant's penalty-phase claim, the Court observed that the "three fundamental legal principles" enumerated in *Illinois v. Allen*—that is, the presumption of innocence, communication with counsel, and the dignity of the judicial process—"apply with like force to penalty proceedings." *Id.* at 630-32. Given these "weighty considerations," the sentencing court must make a "case specific" determination that "reflect[s] particular concerns," including "special security needs or escape risks, related to the defendant on trial," before placing defendants in "physical restraints visible to the jury during the penalty phase of a capital proceeding." *Id.* at 633.

*Deck* clearly established a due-process rule against the routine use of physical restraints during a penalty-phase proceeding on May 23, 2005; however, Adams's conviction became final one week earlier on May 16, 2005. *Deck*, 544 U.S. at 622; *Adams v. Ohio*, 544 U.S. 1040 (2005) (denying certiorari); *see also Beard v. Banks*, 542 U.S. 406, 411 (2004) ("State convictions are final 'for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.'" (quoting *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994)0). Thus, Adams can obtain relief only if the constitutional rule against routine physical restraints during the penalty phase was clearly established Supreme Court law before *Deck*. In other words, Adams can rely on this rule only if *Deck* did not announce a "new" rule. *Chaidez v. United States*, 133 S. Ct. 1103, 1107 (2013).

We have held that "the principles underlying *Deck* were, in fact, clearly established by the Supreme Court before its decision in *Deck*." *Mendoza v. Berghuis*, 544 F.3d 650, 653-54 (6th Cir. 2008). In *Deck*, the Supreme Court recognized a longstanding prohibition on the routine use of shackles after reviewing eighteenth-century English cases, twentieth-century state court cases, and earlier Supreme Court decisions. *Deck*, 544 U.S. at 626–29. Thus, the Sixth Circuit has "treat[ed] *Deck*'s holding, *in toto*, as if it were clearly established as of the time of [earlier] state-court decisions." *Mendoza*, 544 F.3d at 654; *see also Lakin v. Stine*, 431 F.3d 959, 963 (6th Cir. 2005) (holding that *Deck* applies to cases that were final before its issuance because

"the principle that shackling a defendant at trial without an individualized determination as to its necessity violates the due process clause was clearly established long before *Deck* was decided."). However, the Sixth Circuit cases holding that the shackling rule was clearly established before *Deck* dealt only with the guilt phase. *Earhart v. Konteh*, 589 F.3d 337, 348 (6th Cir. 2009); *Mendoza*, 544 F.3d at 654; *Robinson v. Gundy*, 174 F. App'x 886, 893 (6th Cir. 2006); *Lakin*, 431 F.3d at 963.

Adams indicated in his brief and clarified at argument that his shackling challenge is limited to the penalty phase. In *Deck*, the Supreme Court held that "[t]he considerations that militate against the routine use of visible shackles during the guilt phase of a criminal trial apply with like force to penalty proceedings in capital cases." *Deck*, 544 U.S. at 632. These considerations—the presumption of innocence, the defendant's communication with counsel, and the dignity of the trial—were established in *Allen* long before *Deck*. Although *Allen* was an armed-robbery case without a separate penalty phase, its reasoning was not confined to the guilt phase; *Allen* stated that "no person should be tried while shackled and gagged except as a last resort," and the penalty phase is part of the trial. *Allen*, 397 U.S. at 344. Similarly, in *Holbrook*, the Supreme Court's statement that "shackling[] should be permitted only where justified by an essential state interest specific to each trial" encompassed the entire trial, not just the guilt phase. *See* 475 U.S. at 568-69. Because we find that the rule against shackling during trial was clearly established before *Deck*, we need not distinguish between the guilt and penalty phases.

In *Earhart*, we determined that the visibility of a physical restraint upon a defendant to a jury was a critical factor to obtaining relief in such circumstances.

> If [a petitioner]'s stun belt was a visible restraint, due process mandates an individualized finding of necessity before the state courts could require [a petitioner] to wear the belt. If the stun belt was not visible, then there is not a violation of clearly established federal law sufficient to grant the writ.

589 F.3d at 349 (collecting cases) (citations omitted). Here, at least in the guilt phase, there is no evidence that the jury knew that Adams was wearing a stun belt. Adams does not endeavor to demonstrate by clear and convincing evidence that the Ohio Supreme Court erroneously found that the stun belt worn by Adams was not visible to the jury. *Adams*, 817 N.E.2d at 53 ("Second, because Adams was wearing clothing over the device, the device was not visible to the jury and,

unless it was activated, the jury would not know that it was being worn."). We have previously acknowledged that *Deck* "is expressly limited to cases where the defendant's shackles *are* 'visible to the jury' during trial." *Mendoza*, 544 F.3d at 655 (quoting *Deck*, 544 U.S. at 629). As such, the Ohio Supreme Court's resolution of this claim was not an unreasonable application of, or contrary to, Supreme Court precedent. *See White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.").

However, in his unsworn statement during the penalty phase, Adams told the jury that he was wearing a stun belt: "I can speak freely with you without being under a constant threat of being zapped by a machine or device I've been made to wear." Even assuming that Adams's revelation during the penalty phase that he was wearing a stun belt satisfies the visibility requirement set forth in *Deck*, Adams has not shown that he is entitled to habeas relief. *Deck* explained that the placement of visible physical restraints on a criminal defendant does not necessarily violate constitutional protections if done after an individualized determination arising from security concerns:

> Given the presence of similarly weighty considerations, we must conclude that courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding. The constitutional requirement, however, is not absolute. It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling. In so doing, it accommodates the important need to protect the courtroom and its occupants. But any such determination must be case specific; that is to say, it should reflect particular concerns, say, special security needs or escape risks, related to the defendant on trial.

*Deck*, 544 U.S. at 633. Here, the trial court conducted an evidentiary hearing during which law-enforcement personnel explained why they believed that Adams should wear a stun belt. The trial court learned that Adams's recent convictions for murder and rape placed him in the high-risk segment of the jail population. The trial court reviewed the competency evaluations of Adams that indicated that he could willfully create a disturbance during trial. Further, there was testimony that the stun belt was the safer alternative for securing the courtroom in case of an

outburst by Adams as the impact upon Adams was greatly diminished, and the risk to both security personnel and bystanders was minimized. Adams challenges the finding that security concerns justified ordering the stun belt, but he has not shown that "it was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). In sum, Adams has not established that the state courts made unreasonable factual determinations, or that the Ohio Supreme Court's denial of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court law. Accordingly, the relief Adams seeks is unwarranted.

## II.      The constitutionality of Ohio's lethal injection protocol

We next turn to Adams's contention that lethal injection as a means of execution violates the constitutional prohibition against cruel and unusual punishment. Adams challenged the constitutionality of lethal injection on direct appeal, asserting that "[d]eath by lethal injection constitutes cruel and unusual punishment and denies due process under the state and federal constitutions." The Ohio Supreme Court rejected this claim, explaining it had "previously rejected similar arguments." *Adams*, 817 N.E.2d at 56 (citing *State v. Carter*, 734 N.E.2d 345, 358 (Ohio 2000)). Adams again challenged the constitutionality of execution by lethal injection in his federal habeas corpus petition. The district court denied this claim, noting that "lethal injection is the law of the republic. No federal court has found the lethal injection protocol to be unconstitutional." *Adams*, 484 F. Supp. 2d at 796 (citation omitted).

As an initial matter, we note our recent holding that lethal injection does not violate the Constitution. *See Scott v. Houk*, 760 F.3d 497, 512 (6th Cir. 2014) ("Simply put, lethal injection does not violate the Constitution per se . . . ."). In *Scott*, a similar challenge to the implementation of lethal injection was raised, as a panel of this court observed that "Scott's petition alleges that lethal injection 'inflicts torturous, gratuitous and inhumane pain, suffering and anguish upon the person executed.'" *Id*. at 511. Accordingly, the Ohio Supreme Court's denial of Adams's challenge to the constitutionality of lethal injection as a means of execution did not constitute an unreasonable application of Supreme Court precedent.

The Supreme Court's decision in *Glossip* does not alter our precedent. *Glossip* concerned a 28 U.S.C. § 1983 action challenging Oklahoma's execution protocol. The plaintiffs sought to enjoin the State's use of midazolam in its three-drug lethal injection protocol, alleging that the drug created an unacceptable risk of severe pain. *Glossip*, 135 S. Ct. at 2731. The district court found that the plaintiffs failed to establish that midazolam was ineffective and thus denied the application for a preliminary injunction. *Warner v. Gross*, No. CIV-14-0665-F, 2014 WL 7671680, at *1 (W.D. Okla. Dec. 22, 2014). The Court affirmed the denial, holding that the prisoners had failed to identify "a known and available alternative method of execution that entails a lesser risk of pain, a requirement of all Eighth Amendment method-of-execution claims." *Glossip*, 135 S. Ct. at 2731 (citing *Baze v. Rees*, 553 U.S. 35, 61 (2008) (plurality opinion)). Notably, the Court observed that the record indicated that Oklahoma could not obtain either of the drugs—sodium thiopental and pentobarbital—offered by the petitioners as alternatives to midazolam despite Oklahoma's good-faith efforts. *Id*. at 2738. The Court identified the shortcomings with the petitioners' efforts:

> Petitioners do not seriously contest this factual finding, and they have not identified any available drug or drugs that could be used in place of those that Oklahoma is now unable to obtain. Nor have they shown a risk of pain so great that other acceptable, available methods must be used. Instead, they argue that they need not identify a known and available method of execution that presents less risk. But this argument is inconsistent with the controlling opinion in *Baze*, 533 U.S. at 61, 128 S. Ct. 1520, which imposed a requirement that the Court now follows.

*Id.* The Court further explained that the petitioners had not satisfied their burden of demonstrating that the use of midazolam resulted in a substantial risk of pain, based on the evidence presented at the evidentiary hearing. *Id*. at 2739-46.

Here, Adams does not challenge the particular procedure adopted by Ohio as its lethal injection protocol. Rather, in his reply brief, Adams clearly sets forth the bases for his argument:

> Mr. Adams' argument is premised on three notions, none of which are addressed in any meaningful manner by the Warden; first, any reliance on *Baze v. Rees*, 53 U.S. 35 (2008)[,] is misplaced in that it fails to contemplate the difficulties in carrying out executions; second, its failure to recognize that the ever-shifting protocol has engendered fear and mental anguish to those on death row who do not yet have execution dates; and third, that psychological harm is just as harmful

as a physical harm. Finally, Mr. Adams has a response to what he characterizes as the Warden's attempt to revisit the issue of whether Mr. Adams' lethal injection claim is cognizable in habeas.

None of Adams's arguments justify relief.

*Baze* establishes the standard by which Eighth Amendment method-of-execution claims are governed. Noting that the Supreme Court "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment," *Baze*, 553 U.S. at 48, the Court nevertheless reviewed Baze's allegation that Kentucky's lethal injection protocol violated the Eighth Amendment. Baze alleged "a significant risk that the procedures will *not* be properly followed—in particular, that the sodium thiopental will not be properly administered to achieve its intended effect—resulting in severe pain when the other chemicals are administered." *Id*. at 49. The Court explained that:

> A stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain. He must show that the risk is substantial when compared to the known and available alternatives. A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.

*Id*. at 61.

Adams, like the *Baze* and *Glossip* petitioners, has failed to satisfy this burden. He does not claim that the protocol creates a demonstrated risk of severe pain, let alone establish that this is the case. Instead, he focuses upon the psychological toll that allegedly occurs as a result of the changes made to the lethal injection protocol even before an execution date has been set. Adams acknowledges that he failed to present this claim to the state courts, nor did he raise it in his habeas petition. Because this basis for relief was not included in Adams's initial habeas corpus petition, it is precluded in this context. *See Montgomery v. Bobby*, 654 F.3d 668, 685 (6th Cir. 2011); *Chandler v. Jones*, 813 F.2d 773, 777 (6th Cir. 1987) (noting the court's rejection of "attempts by habeas petitioners to assert new claims on appeal not presented in their petition or proceedings below").

But even expanding the original claim to include psychological harm, Adams does not explain how his sentence is contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Adams relies on *In re Medley*, 134 U.S. 160, 172 (1890), where the Supreme Court considered the habeas corpus petition of a Colorado inmate sentenced to death. After the petitioner's conviction and sentence, a new Colorado law took effect forbidding the warden from informing prisoners of their execution date. *Id.* at 171-72. The Supreme Court held that the new statute was an ex post facto law creating additional punishment because of the "immense mental anxiety" resulting from the secrecy surrounding the petitioner's execution date, noting the "most horrible feelings" of an inmate awaiting execution. *Id.* at 172. Adams analogizes an unknown execution date to an unknown execution protocol, but this analogy is not sufficient to demonstrate clearly established Eighth Amendment law on psychological harm.

Adams also relies on *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Hall v. Florida*, 134 S. Ct. 1986 (2014). In *Atkins*, the Supreme Court held that the execution of persons with intellectual disabilities violated the Eighth Amendment. 536 U.S. at 321. In *Hall*, the Supreme Court invalidated a Florida rule requiring defendants to obtain a score of 70 on an IQ test before raising a claim of intellectual disability under *Atkins*. 134 S. Ct. at 2001. Adams asserts that "*Hall* and *Atkins* are examples of the recognition that mental or non-physical characteristics are just as limiting as physical injuries," implying that psychological harm is just as serious as physical harm. Even if Adams's description of the cases is accurate, *Atkins* and *Hall* do not establish his entitlement to habeas relief; they do not constitute "clearly established Federal law" prohibiting death-penalty protocols that cause psychological harm. 28 U.S.C. § 2254(d)(1).

Lastly, notwithstanding the warden's observation that a method-of-execution challenge can only be brought in a § 1983 action under *Hill v. McDonough*, 547 U.S. 573 (2006), Adams can bring this claim in a § 2254 proceeding. As the warden submits, *Glossip* stated that *Hill* "held that a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence." *Glossip*, 135 S. Ct. at 2738. As we observed in *Adams*, 644 F.3d at 483, however, Adams's case is distinguishable from *Hill* because Adams argues that lethal injection cannot be administered in a constitutional manner, and his claim "could render his death sentence effectively invalid." *Cf. Hill*, 547 U.S. at

580. Our decision in *Adams* is consistent with the Supreme Court's reasoning in *Nelson*, which suggested that, under a statutory regime similar to Ohio's, "a constitutional challenge seeking to permanently enjoin the use of lethal injection may amount to a challenge to the fact of the sentence itself." 541 U.S. at 644. Thus, to the extent that Adams challenges the constitutionality of lethal injection in general and not a particular lethal-injection protocol, his claim is cognizable in habeas. *Adams*, 644 F.3d at 483. However, as the Supreme Court observed in *Glossip*, a challenge to a particular procedure that concedes the possibility of an acceptable alternative procedure is properly brought in a § 1983 action. *Glossip*, 135 S. Ct. at 2738.

Adams may still have a means of exploring a method-of-execution claim in his § 1983 action challenging Ohio's lethal injection protocol. *See In re Ohio Execution Protocol Litig.*, No. 2:11-CV-01016-GLF-MRA (S.D. Ohio) (Frost, J.). In *Frazier v. Jenkins*, a panel of this court denied relief in a habeas challenge to the constitutionality of Ohio's administration of its lethal injection protocol—a challenge to the procedure, not a per se challenge to lethal injection—and explained that the claim should be pursued in a § 1983 action. 770 F.3d 485, 505 (6th Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015). As in *Frazier*, Adams's constitutional challenge to Ohio's protocol can be explored within his ongoing § 1983 action. "[I]n order to obtain relief from his sentence, [Adams] would first have to gather facts showing that Ohio is unable to administer lethal injection in a constitutionally permissible manner. And this is precisely the type of discovery that [Adams] can pursue in his § 1983 litigation." *Scott*, 760 F.3d at 512.

## CONCLUSION

For the reasons set forth above, we AFFIRM the district court's denial of Adams's petition for a writ of habeas corpus.