NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0183n.06

No. 18-3101

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| RICHARD BAYS, | ) | **FILED** |
| | ) | Mar 30, 2020 |
| Petitioner-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| WARDEN, CHILLICOTHE CORRECTIONAL | ) | COURT FOR THE |
| INSTITUTION, | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE:  GIBBONS, KETHLEDGE and DONALD, Circuit Judges.

JULIA S. GIBBONS, Circuit Judge.  In December 1995, Bays was convicted of aggravated murder and aggravated robbery and sentenced to death by a three-judge panel in Greene County, Ohio.  After exhausting his state remedies, in 2008 Bays filed a habeas corpus petition with the United States District Court for the Southern District of Ohio.  The district court denied Bays's petitions on all claims but granted Bays a certificate of appealability on five issues.

On appeal to this court, Bays argues that his confession was involuntary and his lethal injection claims are cognizable in a habeas corpus proceeding.  We disagree.  First, the officer's accurate recitation of potential penalties faced by Bays did not constitute an implied promise of leniency that might cause Bays to involuntarily confess, and the Supreme Court of Ohio's factual determinations regarding his confession were not unreasonable.  Second, this court's precedent in

*In re Campbell*, 874 F.3d 454 (6th Cir. 2017), forecloses Bays's argument that his lethal injection claims are cognizable in habeas rather than as a claim under 42 U.S.C. § 1983.

We affirm the district court's denial of Bays's petition.

I.

In 1995, Bays was convicted of aggravated robbery and aggravated murder of Charles Weaver. A three-judge panel in Greene County, Ohio sentenced him to death. On direct appeal, *State v. Bays*, 716 N.E.2d 1126, 1131–33 (Ohio 1999), the Ohio Supreme Court made the following findings of fact:

> On November 15, 1993, appellant, Richard Bays, robbed and murdered Charles Weaver. Bays was convicted of aggravated murder with a death specification and sentenced to death.

> Seventy-six-year-old Charles Weaver lived in Xenia with his wife Rose. On November 15, 1993, Weaver's daughter, Betty Reed, went to her parents' house to see if they needed anything. Betty Reed and Rose Weaver decided to do some shopping and left the house together sometime between noon and 12:30 p.m. Between 1:30 and 2:30 that afternoon, Iris Simms (who lived near the Weavers' house) saw a slim man in his late twenties, with shoulder-length brown hair, walk onto Weaver's porch and approach the door.

> Howard Hargrave, an acquaintance of Richard Bays, was standing around with two other people on Xenia's Main Street that afternoon when Bays approached him, out of breath, and asked whether Hargrave "knew anyone that had any drugs." According to Hargrave, Bays appeared "nervous" and "kept looking around." Hargrave noticed a red stain on Bays's T-shirt that looked like blood.

> Betty Reed drove her mother home at about 5:30 p.m., accompanied by her son Michael. Dusk had fallen, and Betty noticed that no lights were on in the house, not even "a flicker of a television set." This was unusual enough that she and her son decided to escort Mrs. Weaver inside.

> Michael Reed went in first. Turning on a light, he saw his grandfather's wheelchair standing empty. He then entered the kitchen. There he found Mr. Weaver lying on the floor. Michael told his mother to call 911.

> Paramedics arrived in response to the 911 call, found Mr. Weaver dead, and summoned Xenia police officers to the scene. Officers found a shattered plastic tape recorder and a large, square-shaped battery charger with blood on it. The bedroom was in extreme disarray—a "total shambles," Betty Reed later testified— with drawers pulled out and their contents dumped on the floor. The bedroom had

2

not been in that condition when Betty Reed and Mrs. Weaver left the house that afternoon.

Weaver's body was taken to the Montgomery County Coroner's Office. The ensuing autopsy showed that Weaver had suffered two stab wounds to the chest and three incised wounds on the neck. He also had several contusions, abrasions, and lacerations on top of his head, consistent with blows from a square, blunt object. The deputy coroner conducting the autopsy concluded that Weaver died of "a stab wound to the chest and blunt impact injuries to the head."

On November 16, the day after the murder, Xenia police detective Daniel Savage decided to interview Richard Bays.

At first, Bays told Savage that he had not been at Weaver's house on the day of the murder. However, Savage told Bays that someone had seen him there and that "if his [Bays's] prints matched the ones on Mr. Weaver's front door, then I [Savage] would be asking him to explain it." Bays then admitted that he had been at Weaver's house around 2:00 p.m. on November 15. He said he had coffee with Weaver, chatted, and left by 2:15.

However, an inconsistency in Bays's statement aroused Savage's curiosity. Bays told Savage that Weaver had been sitting in his wheelchair during Bays's visit and had not taken out his wallet. Yet Bays had also said that Weaver had the wallet in his back pocket during the visit. If Weaver was sitting in the wheelchair, Savage wondered, how could Bays have known that the wallet was in Weaver's back pocket?

On November 19, an informant told Savage that Weaver's killer had dropped the wallet, along with some clothing he had worn during the crime, into a storm sewer near Bays's house. Based on this information, Savage and Detective Daniel Donahue interviewed Bays again on November 19. During this interview, Bays confessed to killing Weaver.

Bays told the detectives that he went to Weaver's house after smoking some crack. He asked Weaver to lend him $30, but Weaver said he had no money. So Bays picked up the battery charger and hit Weaver on the head with it twice. When the battery charger's handle broke off, Bays started to run away, but then Weaver shouted that he was going to call the police. Bays then picked up a portable tape recorder and went back to hit Weaver on the head with it. The blow shattered the recorder, so Bays dropped it and attacked Weaver with a sharp kitchen knife. Bays admitted that he cut Weaver's throat and thought that he stabbed him in the chest.

Weaver fell out of his wheelchair, and Bays took the wallet from Weaver's back pocket. Weaver's wallet contained $25 cash and $9 worth of food stamps. Bays then went into the bedroom and dumped out the contents of the drawers. Then he fled. He subsequently bought crack with Weaver's $25.

Bays told the detectives that he threw Weaver's wallet down the storm sewer at the northwest corner of Second and Monroe Streets, along with the T-shirt

and glove he had worn during the murder. At the end of Bays's statement, Savage placed him under arrest.

When detectives searched the storm sewer at Second and Monroe, they found the T-shirt, glove, and wallet, just as Bays had said. Betty Reed, who had given that wallet to her father, identified it in court.

While held in the county jail, Bays discussed his crime with another inmate, Larry Adkins. Adkins testified that Bays had told him that he "hit [Weaver] with a battery charger" and when Weaver fell from his chair, Bays "took his wallet and * * * stabbed him in the chest. Then he was almost on his way out and he turned around and cut [Weaver's] throat * * * to make sure he wasn't alive."

The Ohio Supreme Court affirmed Bays's conviction and sentence and held that his confession to police was voluntary. *Bays*, 716 N.E.2d at 1137. Bays filed several post-conviction petitions for relief. *See State v. Bays*, No. 2014-CA-24, 2015 WL 2452324 (Ohio Ct. App. May 15, 2015).

In 2008, Bays filed his first habeas corpus petition under 28 U.S.C § 2254. The petition raised numerous claims including, as relevant to this appeal, that Bays's confession was involuntary and should have been suppressed. A magistrate judge held an evidentiary hearing and determined that the petition should be denied. The district court granted Bays's certificate of appealability ("COA") on his claim that his confession was involuntary. Bays filed for leave to file a second amended habeas petition. The district court granted the motion, and Bays filed an amended petition raising four claims challenging the constitutionality of Ohio's lethal injection protocol. The district court denied Bays's lethal injection claims, finding them precluded by *In re Campbell*, 874 F.3d 454 (6th Cir. 2017), but it expanded the COA to include these claims. We denied Bays's request to expand the COA.

## II.

"We review a district court's denial of a habeas petition de novo." *Mitchell v. MacLaren*, 933 F.3d 526, 531 (6th Cir. 2019) (citing *Cleveland v. Bradshaw*, 693 F.3d 626, 631 (6th Cir. 2012)). "The district court's findings of fact are reviewed for clear error, and its legal conclusions

on mixed questions of law and fact are reviewed de novo." *Id.* (citing *Gumm v. Mitchell*, 775 F.3d 345, 359–60 (6th Cir. 2014)).

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), "a court considering a habeas claim must defer to any decision by a state court concerning the claim, unless the state court's judgment: (1) resulted in a decision that was contrary to clearly established federal law as determined by the United States Supreme Court; (2) involved unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (3) was based on an unreasonable determination of the facts in light of the evidence presented in the state court." *Schreane v. Ebbert*, 864 F.3d 446, 450 (6th Cir. 2017) (citing 28 U.S.C. § 2254(d)(1), (2)). "A state court's decision involves an unreasonable application of federal law if the state-court decision identifies the correct governing legal principle in existence at the time, but unreasonably applies that principle to the facts of the [petitioner's] case." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (internal quotations omitted) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011)). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (first quoting 28 U.S.C. § 2254(d)(2), then quoting *id.* § 2254(e)(1)).

III.

On appeal, Bays challenges the district court's denial of his habeas petition. His claims before this court are: (1) his inculpatory statements were improperly admitted at trial; (2) Ohio cannot constitutionally execute him because the only manner available under the law to execute him violates his Eighth Amendment, Due Process Clause or the Privileges or Immunities Clause

of the Fourteenth Amendment, or Equal Protection Clause rights; and (3) Ohio cannot constitutionally execute him because Ohio's violations of federal law constitute a fundamental defect in the execution process, and the only manner of execution available for execution depends on state execution laws that are preempted by federal law. For the following reasons set forth below, we find no basis for granting habeas relief.

## A.

Bays argues that the Ohio Supreme Court's decision was based on unreasonable factual determinations. Bays also challenges the admissibility of his confession on the grounds that the police's implied promises of leniency coerced him into making an involuntary statement in violation of the Due Process Clause of the Fourteenth Amendment.

## 1.

Bays first argues that the Ohio Supreme Court's decision was based on an unreasonable determination of the facts and therefore should receive no deference by this court under 28 U.S.C. § 2254(d)(2). Specifically, Bays points to the court's (1) conclusion that Savage's statements were not implied promises of leniency; and (2) finding that Bays did well in school until he began engaging in substance abuse. Bays has not provided clear and convincing evidence that these factual findings are unsupported by the record. *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007).

The conclusion that Savage did not promise leniency is reasonable. Bays points to statements by Savage informing Bays that he was facing "a possible death penalty case" and that "withholding the truth . . . could only hurt him and not benefit him." CA6 R. 26, Appellant Br., at 19 (quoting DE 152-1, PageID 5839–40). Despite Bays's contention, it is not clear that the detective's statements regarding the different penalties constituted an implied promise of leniency

6

and, even if it did, "promises to recommend leniency and speculation that cooperation will have a positive effect do not make subsequent statements [by the defendant] involuntary." *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (quoting *United States v. Delaney*, 443 F. App'x 122, 129 (6th Cir. 2011)). Further, courts have repeatedly held that it is not coercive for police to inform the defendant accurately of the potential penalties that he faces. *See United States v. McNeal*, 862 F.3d 1057, 1064 (10th Cir. 2017) (collecting cases). Here the record supports the state court's determination that Savage did not promise that Bays would not receive the death penalty in return for a confession. The state court's view of the facts was not unreasonable.

The Ohio Supreme Court's finding that Bays "did well in school until be began engaging in substance abuse" is also reasonable. Specifically, this finding is supported by Dr. Burch's testimony as an expert during Bays's mitigation hearing and expert report. Burch testified that, based on Bays's academic records, he did well in school until about fourth grade when he began to drink alcohol. There is no testimony prior to this line of questioning consistent with Bays's argument that Burch's testimony was limited or modified such that Bays only did well in school for someone who suffered from cognitive deficits. The court's finding that Bays "did well in school until he began engaging in substance abuse" is reasonable in light of Burch's report and testimony.

2.

The primary issue before us is whether the Ohio Supreme Court unreasonably applied federal law to conclude that Bays voluntarily confessed. The Ohio Supreme Court based its conclusion that the confession was voluntary on its assessment of the totality of the circumstances. *State v. Bays*, 716 N.E.2d 1126, 1136–37 (Ohio 1999). The district court correctly denied Bays's habeas petition because it was not contrary to, or an unreasonable application of, clearly

established federal law for the Ohio Supreme Court to hold that Bays voluntarily confessed. Upon weighing the totality of the circumstances surrounding the confession, it was objectively reasonable for the Ohio Supreme Court to hold that investigators did not overbear Bays's will when obtaining his confession.

Under clearly established Supreme Court law, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985); *see also Rogers v. Richmond*, 365 U.S. 534, 540–45 (1961). The "tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness." *Miller*, 474 U.S. at 110. To determine whether the will of the defendant was overborne at the time he confessed, courts must consider the totality of the circumstances surrounding the confession, "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27 (1973); *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993). "Factors considered in assessing the totality of the circumstances include the age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep." *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006) (citing *Schneckloth*, 412 U.S. at 226); *see also Withrow*, 507 U.S. at 693–94 (collecting factors).

Bays argues that the state court acted contrary to established precedent by failing to consider his limited intellectual capacity when determining whether his confession had been influenced by an implied promise of leniency. Contrary to Bays's contention, the Ohio Supreme

Court correctly analyzed the voluntariness of Bays's confession under the totality of the circumstances and reasonably held that Bays's confession was voluntary. As the Ohio Supreme Court noted:

> Bays went to the station voluntarily. He was interrogated for only twelve minutes before confessing. He was in his late twenties and had been arrested before. There was no evidence of physical abuse or deprivation. Savage did raise his voice when he thought Bays was lying and may have hit the table as well, but there was no evidence of any direct threats. Bays heard his *Miranda* rights, acknowledged that he understood them, and signed a waiver, the validity of which is not challenged here. Savage testified that Bays was calm and did not seem nervous.

*Bays*, 716 N.E.2d at 1137. The court also noted the factors weighing against voluntariness, including the fact that Bays was misled "as to the strength of the evidence" and had a "low IQ and childhood head injuries," the court concluded that "the factors pointing to voluntariness far outweigh those negating voluntariness." *Id.* The court analyzed the totality of the circumstances, including Bays's limited intellectual capacity in determining whether his statement was voluntary. Under the deference required by AEDPA, and given the factors supporting a finding that Bays's confession was voluntary, the decision of the Ohio Supreme Court was a reasonable application of federal law.

B.

Bays's other claims for relief relate to the alleged unconstitutionality of Ohio's lethal injection protocol. Bays argues that the district court erred in holding that his lethal injection claims were not cognizable in a writ of habeas corpus. The government contends that Bays's claims are foreclosed by this circuit's precedent in *In re Campbell*, 874 F.3d 454 (6th Cir. 2017). We agree.

This court has considered at length which procedural vehicle plaintiffs must use to bring method-of-execution claims. In *Adams III*, an Ohio death row inmate challenged Ohio's lethal injection protocol under the Eighth Amendment. *Adams v. Bradshaw (Adams III)*, 826 F.3d 306,

308 (6th Cir. 2016). The court resolved *Adams III* on procedural grounds as Adams failed to include this claim in his initial habeas petition, but the court proceeded to discuss, in dicta, the appropriate vehicle to bring the claim. *Id.* at 320–21. Adams generally argued that "[d]eath by lethal injection constitutes cruel and unusual punishment and denies due process under the state and federal constitutions" because shifting protocols "engender[] fear and mental anguish . . . ." *Id.* at 318–19. The court distinguished *Hill v. McDonough*, 547 U.S. 573 (2006), explaining that "Adams's case is distinguishable from *Hill* because Adams argues that lethal injection cannot be administered in a constitutional manner, and his claim 'could render his death sentence effectively invalid.'" *Id.* at 321. Thus, the court concluded that "to the extent that Adams challenges the constitutionality of lethal injection in general and not a particular lethal-injection protocol, his claim is cognizable in habeas." *Id.*

In *Campbell*, a state prisoner challenged the constitutionality of Ohio's lethal injection protocol as erratic and unpredictable and alleged that any method of execution was unconstitutional in light of his deteriorating physical condition. 874 F.3d at 464–65. The court recognized that "the law on this subject is not clear and has been the subject of several recent, published decisions by this Circuit and the Supreme Court," and therefore, "pause[d] at the outset to clarify the standard." *Id.* at 460. Noting that, in *Glossip v. Gross*, 135 S. Ct. 2726 (2015), "the Court expressly refused to countenance the possibility that a state could be left without any lawful means of execution," *Campbell* held that "[n]o longer can a method-of-execution claim impair a death sentence itself." *Id.* at 462. *Campbell* concluded that, because *Glossip* "barred all habeas petitions challenging 'a particular application of a particular protocol to a particular person' as unconstitutionally painful," such method-of-execution claims are cognizable only under § 1983 *Id.* (citing *In re Tibbetts*, 859 F.3d 403, 406 (6th Cir. 2017)). As to Campbell's second challenge,

the court rejected Campbell's analogy to competency claims and held that "*Glossip* makes clear that a prisoner cannot invalidate his death sentence simply by asserting that *every* method offered by state statute will be unconstitutionally painful." *Id.* at 465–67.

While Bays contends that we should follow *Adams III*'s approach, *Campbell* forecloses Bays's habeas claims regarding the alleged unconstitutionality of Ohio's lethal injection protocols. *Campbell* correctly noted that *Adams III*'s holding rested on procedural default and its subsequent discussion of the substantive claim was not necessary to that holding and, thus, not binding. *Id.* at 463–64. *Campbell*'s holding is binding and decisively disposes of Bays's claims for relief. *Campbell* explains that, although Ohio may only permit execution by lethal injection today, "[t]he Ohio legislature could, tomorrow, enact a statute reinstating the firing squad as an alternative method of execution." *Id.* at 465. A court order "would not impair the validity of Campbell's death sentence," and therefore, a method-of-execution claim is not cognizable in habeas. *Id.* Bays's argument that his claims attack his death sentence itself because Ohio does not currently allow other methods of execution is unavailing under *Campbell*'s reasoning. Bays's claims challenging the application of lethal injection as causing an unconstitutional amount of severe pain and suffering are method-of-execution claims properly brought under § 1983, not habeas.

Bays's argument distinguishing *Campbell*'s procedural posture is similarly unavailing. *Campbell* indicated that "all method-of-execution claims" challenging a particular application of a particular protocol to a particular person should be pursued under § 1983, 874 F.3d at 462–63, and the procedural posture of *Campbell* does not limit its application only to method-of-execution claims brought in subsequent habeas proceedings.

## IV.

We affirm the district court's denial of Bays's habeas petition.

11