RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0176p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

VAUGHN MITCHELL,

*Petitioner-Appellant*,

*v.*

No. 17-2444

DUNCAN MACLAREN, Warden,

*Respondent-Appellee*.

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:15-cv-10356—Linda V. Parker, District Judge.

Argued: May 9, 2019

Decided and Filed: August 1, 2019

Before: SUHRHEINRICH, BUSH, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Angela Dunay, Seth Yost, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Scott R. Shimkus, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Angela Dunay, Seth Yost, Stephen L. Braga, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Scott R. Shimkus, Andrea M. Christensen-Brown, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

───────────────

## OPINION

───────────────

JOHN K. BUSH, Circuit Judge. Vaughn Mitchell was convicted in Wayne County, Michigan, of first-degree murder, carjacking, and felony firearm possession for chasing and

beating Michael Jorden, shooting and killing him, and then stealing his car. In his habeas petition, pursuant to 28 U.S.C. § 2254, Mitchell raises two issues: (1) whether the interrogating officer (Detective Collins) misled Mitchell to believe that he did not have a right under the Fifth Amendment to have counsel present during interrogation and misstated the availability of a defense attorney in the county where Mitchell was interrogated; and (2) whether Detective Collins provided *Miranda*[1] warnings to Mitchell in "mid-stream," in violation of Supreme Court case law discrediting this two-step technique.

The manner in which Collins interacted with Mitchell regarding the right to counsel is troubling. However, the Michigan Supreme Court's decision—that the *Miranda* warnings, considered as a whole, adequately advised Mitchell of his rights—was not contrary to or an unreasonable application of Supreme Court precedent. Accordingly, we **AFFIRM** the district court's denial of Mitchell's § 2254 petition.

## I. BACKGROUND

On June 21, 2008, Mitchell and Jorden got into a dispute over the ownership of a gun, resulting in Jorden's death.

According to Mitchell, his father, Vaughn Brown, had given him a gun and Mitchell had, in turn, given that weapon to Jorden. Jorden subsequently lost the gun but gave Mitchell another, which Mitchell mistakenly thought was a replacement for the lost firearm until Jorden asked Mitchell to pay for the new one. Before further addressing the matter with Jorden, Mitchell called his father for "advice as to the situation." R. 10-11, PageID 1130.

Brown, Mitchell, and Jorden then all met, and discussions over the ownership of the gun soon escalated into a physical altercation. Apparently fearing that Jorden would use a gun on him, Mitchell used a pipe-like metal object given to him by Brown to strike Jorden on the head. Jorden retreated, but Mitchell pursued, hitting him at least twice more. What happened next is subject to dispute based on differing accounts of witnesses. The disagreement essentially boils down to whether Brown or Mitchell shot Jorden. The jury determined that Mitchell fired a shot

---

[1]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

that killed Jorden, and then either Brown or Mitchell shot at Jorden's body multiple times. The jury also determined that, after the shooting, Mitchell took Jorden's keys and money and drove off in Jorden's vehicle.

Mitchell's affidavit recounts the following as to his arrest and interrogation. He was arrested on September 9, 2008. The following morning, Detective Collins took Mitchell out of his cell, interrogated him for thirty minutes without reading him his *Miranda* rights, and then returned him to his cell. In the afternoon, Collins again removed Mitchell from his cell and again questioned him without *Miranda* warnings. During this second interrogation, Mitchell told Collins that there had been "an incident about a gun *before* June 21," R. 1-2, PageID 169 (emphasis added), prompting Collins to ask Mitchell about the night of June 21, when the shooting happened. Mitchell responded that "there was a lot of us who were just hanging around getting ready to go out." *Id.* at PageID 169–70. When Collins pressed for further details, Mitchell told Collins that he "would tell him what happened," but that Mitchell would need "to start from the beginning so he would understand." "As soon as I said this," according to Mitchell's affidavit, "Detective Collins stopped me." *Id.* at PageID 170. Collins then took Mitchell upstairs to an interrogation room to be Mirandized and video-recorded.

Collins's recollection of his interaction with Mitchell is somewhat different than Mitchell's. Collins testified at trial that he had only one conversation with Mitchell prior to the video-recorded interrogation and that the conversation lasted approximately five minutes. During this conversation, Collins told Mitchell he knew Mitchell was involved in a homicide because an eyewitness linked Mitchell to the crime. Collins then asked Mitchell to confirm his involvement, "[a]nd when he started talking about that he had some involvement, that's when I took him upstairs." R. 10-10, PageID 937.

Both Mitchell and Collins agree that once upstairs, Collins gave Mitchell a sheet explaining Mitchell's *Miranda* rights. The "Constitutional Rights Certificate of Notification" stated:

1.  I have a right to remain silent and that I do not have to answer any questions put to me or make any statements.

2. Any statement I make or anything I say will be used against me in a Court of Law.

3. I have the right to have an attorney (lawyer) present before and during the time I answer any questions or make any statement.

4. If I cannot afford an attorney (lawyer), one will be appointed for me without cost by the Court prior to any questioning.

5. I can decide at any time to exercise my rights and not answer any questions or make any statement.

R. 1-2, PageID 163. Then the following exchange occurred:

INVESTIGATOR [Collins]: Okay, Vaughn, I'm going to give you your Constitutional Rights . . . . I need you to read the first Right out loud.

MR. MITCHELL: I understand the [sic] I have the right to remain silent and that I do not have to answer any questions put to me or make any statements.

INVESTIGATOR: You can read the rest to yourself. Do you understand that?

MR. MITCHELL: I ought to just read #1 again.

(10 min. pause—Mr. Mitchell reading his rights)

INVESTIGATOR: Do you understand—did you finish?

MR. MITCHELL: Uh, I do have a question. Number 4, that's not speaking currently—right now?

INVESTIGATOR: Well the question speaks for itself. If I cannot afford an attorney—you probably can—one will be appointed to me without cost by the court. That means down the line.

MR. MITCHELL: Meaning when the court . . . .

INVESTIGATOR: Right-right-right. Did you get to the next one?

MR. MITCHELL: Yeah, I read five.

INVESTIGATOR: Okay, now read that part right there.

. . . .

MR. MITCHELL: I understand that these are my rights under the law, I have not been threatened or promised anything. I desire or [sic] to answer any questions put to me at this time.

INVESTIGATOR: Do you understand?

MR. MITCHELL: Yeah, I understand.

INVESTIGATOR: Okay, I want you to put your initials by 1, 2, 3, 4, 5 right there.

MR. MITCHELL: You say by 1, 2, 3, 4 and 5?

INVESTIGATOR: Yeah, put your initials—that means you understand your rights as far as I'm concerned.  It's just a formality.

*Id.* at PageID 129–30.

Another interrogation then commenced, during which Mitchell admitted to having been at the scene of the murder, having beaten Jorden, and having taken money and drugs from the victim.  Mitchell denied shooting Jorden or taking his vehicle.  Instead, Mitchell said that Brown shot Jorden.

Defense counsel filed a pre-trial motion to suppress Mitchell's post-warning statements. The trial court denied the motion.  Following a jury trial in Wayne County Circuit Court, Mitchell was convicted of two counts of first-degree murder (felony murder and first-degree premeditated murder), in violation of Michigan Compiled Laws § 750.316(1)(a)–(b); carjacking, in violation of Michigan Compiled Laws § 750.529a; and felony firearm possession, in violation of Michigan Compiled Laws § 750.227b.

## II.  PROCEDURAL POSTURE

Mitchell filed an appeal in the Michigan Court of Appeals, raising several claims.  That court denied relief on some of Mitchell's claims and declined to address other claims but remanded for an evidentiary hearing to determine, among other things, whether Collins failed to reasonably convey to Mitchell his right to have an attorney present both before and during questioning, and whether Collins failed effectively to advise Mitchell of his rights because he gave a "mid-stream" *Miranda* warning.  *People v. Mitchell*, No. 293284, 2011 WL 5064301 (Mich. Ct. App. Oct. 25, 2011) (per curiam).  The State appealed to the Michigan Supreme Court, which reversed the Michigan Court of Appeals' grant of remand and found there was no *Miranda* violation.  *People v. Mitchell*, 822 N.W.2d 224 (Mich. 2012) (Mem.).  The entirety of the Michigan Supreme Court's analysis of Mitchell's *Miranda* arguments was as follows:

> The trial court did not err in denying defendant's motion to suppress his confession. "[U]nlike in [*Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L.Ed.2d 643 (2004)], there is no concern here that police gave [defendant] *Miranda* warnings and then led him to repeat an earlier murder confession,

because there was no earlier confession to repeat." In addition, "*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one."

*Mitchell*, 822 N.W.2d at 224 (alterations in original) (first quoting *Bobby v. Dixon*, 565 U.S. 23, 31 (2011), then quoting *Duckworth v. Eagan*, 492 U.S. 195, 198 (1989)). The Michigan Supreme Court also remanded the case to the Court of Appeals to consider the claims that court had declined to address; the Court of Appeals did so and denied Mitchell relief on all issues except one that is not relevant here. *People v. Mitchell*, No. 293284, 2013 WL 951192 (Mich. Ct. App. Feb. 26, 2013) (per curiam).

After exhausting his state-court remedies, Mitchell filed a § 2254 petition in federal district court. The district court denied the petition on October 25, 2017, but granted a Certificate of Appealability ("COA") on Mitchell's claims regarding the admissibility of his custodial statements.

## III.  STANDARD OF REVIEW

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, if a state court has adjudicated the petitioner's claims on the merits, a writ of habeas corpus may not be granted unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

We review a district court's denial of a habeas petition de novo. *See Cleveland v. Bradshaw*, 693 F.3d 626, 631 (6th Cir. 2012). The district court's findings of fact are reviewed for clear error, and its legal conclusions on mixed questions of law and fact are reviewed de novo. *See Gumm v. Mitchell*, 775 F.3d 345, 359–60 (6th Cir. 2014). "[T]he habeas petitioner

has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings were correct." *Henley v. Bell*, 487 F.3d 379, 384 (6th Cir. 2007) (citing 28 U.S.C. § 2254(e)(1)) (other citations omitted).

Mitchell does not suggest that the decision of the Michigan Supreme Court was "contrary to" clearly established federal law. Instead, he contends that it unreasonably applied clearly established federal law. A decision of the state court is an "unreasonable application" when "the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). A federal court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

## IV. DISCUSSION

Mitchell argues that the Michigan Supreme Court unreasonably applied *Miranda* because (1) Collins misled Mitchell to believe that he did not have a Fifth Amendment right to have counsel present during interrogation and Collins misstated the availability of a defense attorney in Detroit; and (2) Mitchell received the *Miranda* warnings "mid-stream," in violation of Supreme Court case law.

A.    Collins's Statements

1.    Misleading Statements: Presence of Counsel

Mitchell takes issue with the Michigan Supreme Court's reliance on *Duckworth*, in which the warnings given to the defendant included the sentence: "We have no way of giving you a lawyer, but one will be appointed for you, if you wish, *if and when you go to court*." 492 U.S. at 198 (emphasis added). The Michigan Supreme Court noted that the *Duckworth* Court upheld that warning. The *Duckworth* Court determined that "*Miranda* does not require that attorneys be

producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one." *Id.* at 204. Finding that the warnings given to Mitchell satisfied this standard, the Michigan Supreme Court found no issue with the *Miranda* warnings he received.

Mitchell attempts to distinguish *Duckworth*. He argues that the Michigan Supreme Court failed to consider why the *Duckworth* Court upheld the warnings: according to Mitchell, it was because the Court determined that the eight sentences of warnings that included the "if and when" sentence at issue clearly conveyed enough information to satisfy *Miranda*. *Id.* at 205. Here, by contrast, Mitchell argues that Collins's response regarding appointment of counsel "down the line" deliberately "suggested [a] limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general." Appellant Br. at 24 (quoting *California v. Prysock*, 453 U.S. 355, 360–61 (1981)).

But Mitchell does not take issue with the written warnings he received, and, as in *Duckworth*, these initial warnings were valid. In *Duckworth*, as here, the valid warnings were accompanied by further explanation from the interrogator about when the defendant could obtain counsel. The further explanation in *Duckworth* ("if and when you go to court") was in written form, whereas here, it was follow-up in the form of Collins's oral statement ("down the line"). Mitchell points to no clearly established law from the Supreme Court making such a distinction relevant or dictating a conclusion that is different from the one in *Duckworth*.

Under *Duckworth*, therefore, the Michigan Supreme Court reasonably determined that nothing in Collins's response tempered or negated the previously given warnings regarding Mitchell's right to counsel before and during interrogation, his right to refuse to answer or stop answering questions, or his right to appointment of counsel. Collins indicated *when* counsel would be *appointed*, but he did not imply that the *right* to an attorney was tied to a future event. *See Duckworth*, 492 U.S. at 204–05. True, when this exchange is considered in the totality of the circumstances, some courts might conclude (as the Michigan Court of Appeals did) that Collins's statement created sufficient ambiguity to raise a question about the adequacy of the warnings. But other jurists could reasonably conclude (as the Michigan Supreme Court did) that pursuant to the Supreme Court's case law, the warnings Mitchell received were adequate under *Duckworth*'s

statement that *Miranda* requires "only that the suspect be informed . . . that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one." *Id.* at 204.

Under AEDPA's deferential standard of review, this reviewing court may not grant relief simply because it might have come to a different conclusion; rather, the state court's application of law must have been unreasonable. *See Taylor*, 529 U.S. at 386 ("Congress intended federal judges to attend with the utmost care to state-court decisions, including all of the reasons supporting their decisions, before concluding that those proceedings were infected by constitutional error . . . ."). Because the Michigan Supreme Court's holding was not an unreasonable application of Supreme Court precedent, we deny relief on this portion of Mitchell's habeas petition.

2. Misleading Statements: Availability of Counsel

Mitchell also contends that the *Duckworth* Court acknowledged that the "if and when you go to court" language "accurately described the procedure for the appointment of counsel in Indiana," 492 U.S. at 204,[2] and so it was relevant to the *Duckworth* Court that the detective did not lie or commit an act of deceit. *See id.* ("We think it must be relatively commonplace for a suspect, after receiving *Miranda* warnings, to ask *when* he will obtain counsel. The 'if and when you go to court' advice simply anticipates that question." (footnote omitted)). In further support of his argument that the veracity of the information given by the officer is relevant to the analysis, Mitchell cites *Prysock*. There, the Supreme Court found *Miranda* warnings to be sufficient when, after the interrogating officer administered them, the juvenile defendant's mother asked the officer a question about the availability of an attorney post-questioning, and the officer correctly responded that the defendant had a right to an attorney now and "when he went to court." 453 U.S. at 357; *see id.* at 360–61. Mitchell argues that the officer's response in

---

[2]We note that the parties contest whether Collins's statement about the availability of an attorney accurately describes the law. Mitchell argues that in the *county* where he was interrogated, there is a defense attorney on call twenty-four hours per day who is available to attend line-ups and interrogations. However, in the *state* of Michigan, courts appoint counsel at the arraignment stage. Mich. Comp. Laws § 775.16. Regardless, we assume for the purposes of our analysis that Collins did not accurately describe the availability of an attorney in the jurisdiction where Mitchell was interrogated.

*Prysock* clarified matters, whereas Collins's response to Mitchell was incorrect and deceptive because it was made to "deliberately confuse[]" Mitchell about the appointment procedure in the county where he was interrogated. Appellant Br. at 23. Thus, according to Mitchell, the Michigan Supreme Court "failed to account for the impact that [Collins's] response . . . had on the sufficiency of the warnings." *Id.*

We disagree. *Jackson v. Frank*, 348 F.3d 658 (7th Cir. 2003), is instructive. In that case, the Seventh Circuit held that an officer's giving an inaccurate description of state law while delivering *Miranda* warnings is not, on its own, a basis for relief in a § 2254 petition. *See Jackson*, 348 F.3d at 665. In *Jackson*, the defendant was arrested and advised of his *Miranda* rights. *Id.* at 660. The defendant then asked if the detective could arrange for an attorney. *Id.* The detective stated that he could not, and that he was going to end the interview. *Id.* The defendant then stated that he wanted to talk, but "asked . . . if he could have a lawyer right now." *Id.* The detective understood this to mean the defendant's "intent . . . was to have a lawyer present there, then and there, right now, and if I could arrange for that." *Id.* The detective said no. *Id.*

The Seventh Circuit acknowledged that the detective's response about the availability of a public defender did not accurately describe state law in Wisconsin, where the interview took place. *Id*. at 661. The defendant ultimately confessed to the crime and later filed a motion to suppress the confession, which the state court denied. *Id.* The defendant then filed a § 2254 petition and appealed its denial to the Seventh Circuit. *Id.* The crux of the defendant's claim was that "1) the detective misstated the availability of a public defender under Wisconsin law, and 2) the detective's statement may have misled [the defendant] to believe that he did not have a right under the Fifth Amendment to have counsel present during interrogation." *Id.* at 663. In support of the second argument, the defendant argued (as does Mitchell) that the detective's statement was particularly misleading because, unlike in *Duckworth*, "in this case the police could have provided counsel." *Id.* at 664.

The Seventh Circuit responded to each argument in turn. As to the first argument, the court held:

> Although the detective may have failed to follow state law by not allowing [the defendant] to contact the public defender's office and mischaracterized the provisions of the law, review of a habeas petition by a federal court is limited to consideration of violations of federal law or the United States Constitution. Neither *Miranda* nor any other provision of federal law requires a public defender to be immediately available to a suspect during interrogation. Thus, to the extent [the defendant's] petition alleges violations of protections guaranteed under state law that are more generous than those required under federal law, we may not enforce these state law provisions through habeas relief.

*Id.* at 663 (internal citations omitted). As to the second argument, the court continued:

> While the Court in *Duckworth* certainly noted the accuracy of the officer's statement under state law, *it is far from clear that the Court's conclusion rested on that fact*. The Court did not explain, for example, how, if this were so, differences in the provision of public defenders under state law should affect a petitioner's understanding and exercise of his federal constitutional rights.

*Id.* at 664 (emphasis added). Thus, the Seventh Circuit held that "[g]iven the similarities between this case and the Supreme Court's decision in *Duckworth*, and the lack of clarity regarding the effect of an officer's misstatement on the voluntariness of a *Miranda* waiver," the defendant could not demonstrate a violation of clearly established federal law, necessary to prevail under § 2254(d)(1). *Id.* at 665. We find the Seventh Circuit's reasoning persuasive and adopt it here.

It is true that in *Jackson*, the Seventh Circuit did not cite *Prysock*, but *Prysock* does not dictate a different conclusion. *Duckworth* was decided after *Prysock*. Although the Supreme Court indicated in *Prysock* that a *Miranda* warning may not be sufficient "if the reference to . . . appointed counsel was linked [to a] future point in time *after* the police interrogation," *Prysock*, 453 U.S. at 360 (emphasis added), the *Duckworth* Court clarified that "the vice referred to in *Prysock* was that such warnings would not apprise the accused of his right to have an attorney present if he chose to answer questions," *Duckworth*, 492 U.S. at 205. Here, as in *Duckworth*, "[t]he warnings . . . did not suffer from that defect," *id.*, because the five sentences in the initial warning explained that Mitchell had a right to counsel before and during questioning, and another sentence detailed the right to stop answering questions. And Mitchell does not dispute that the written warnings conveyed this information. In sum, the Michigan Supreme

Court did not unreasonably apply *Duckworth* when it found the *Miranda* warnings that Mitchell received to be constitutionally adequate.

Resisting this conclusion, Mitchell points to *United States v. Tillman*, 963 F.2d 137 (6th Cir. 1992), in which we found the warnings issued to be constitutionally deficient. But the *Tillman* warnings were plainly deficient: they did not inform the defendant, at any point, that any statements he made could be used against him. *See id.* at 140. As the *Tillman* court noted, "[o]f all of the elements provided for in *Miranda*, this element [that any statements made can be used against a defendant] is perhaps the most critical because it lies at the heart of the need to protect a citizen's Fifth Amendment rights." *Id.* at 141. It is likely that we could have remanded on this point alone in *Tillman*. Accordingly, *Tillman* is not persuasive on the issues in this case.

Finally, *Lathers v. United States*, 396 F.2d 524 (5th Cir. 1968), *abrogation recognized by United States v. Contreras*, 667 F.2d 976 (11th Cir. 1982), is also inapposite. There, the Fifth Circuit held that the *Miranda* warnings were deficient because the defendant "was not advised that he could have an attorney appointed and present . . . before he uttered a syllable." *Id.* at 535. Here, the written warnings given to Mitchell fully advised him of his right to have an attorney present prior to, and during, questioning. *See Contreras*, 667 F.2d at 979 ("*Prysock* . . . stands for the proposition that a *Miranda* warning is adequate if it fully informs the accused of his right to consult with an attorney prior to questioning and does not condition the right to appointed counsel on some future event. A *Miranda* warning need not explicitly convey to the accused his right to appointed counsel 'here and now,' and to the extent that *Lathers* and other precedents of this court require such explicit warnings, they are overruled." (footnote omitted)).

B.      Mid-Stream *Miranda* Warnings and Waiver

In his second claim for relief, Mitchell argues that his post-warning admissions should have been excluded under *Seibert*, because Collins interrogated him on three different occasions and only advised Mitchell of his *Miranda* rights "mid-stream." *See Seibert*, 542 U.S. at 604 (plurality opinion). As an initial matter, we note that Mitchell appears to challenge not only the Michigan Supreme Court's application of the law to the facts of his case but also that court's determination of the facts. *See* 28 U.S.C. § 2254(d)(2). However, the Michigan Supreme Court

does not appear to have adopted either Mitchell's version of the facts or Collins's version (as discussed above, Collins claimed that he questioned Mitchell only once before giving *Miranda* warnings). Instead, the Michigan Supreme Court reversed the Court of Appeals's decision to remand for an evidentiary hearing on the facts surrounding Mitchell's interrogations. The Michigan Supreme Court then stated that no violation of Mitchell's rights had occurred, *see Mitchell*, 822 N.W.2d at 224, indicating either that it had implicitly accepted one view of the facts and found no violation or that it found no violation had occurred on either version of the facts.

Although it is not clear that a factual determination exists for the purposes of AEDPA review, that gap in the record presents no hindrance to our review of Mitchell's claim. Even assuming Mitchell's version of the interrogation sequence is the accurate one, his claim fails because the Michigan Supreme Court's decision was not an unreasonable application of the Supreme Court's case law even on Mitchell's version of the facts.

To understand the applicable Supreme Court case law, we must first consider *Oregon v. Elstad*, 470 U.S. 298 (1985). In *Elstad*, the police went to the suspect's house to take him into custody on a charge of burglary. *Id.* at 300. Before the arrest, one officer spoke with the suspect's mother while the other officer joined the suspect in the living room, *id.* at 300–01, where the officer said he "felt" the suspect was involved in a burglary, *id.* at 301. The suspect said, "Yes, I was there." *Id.*[3] Later, at the station house, the suspect was given *Miranda* warnings, and he made a full confession. *Id.* at 301–02.

The *Elstad* Court reasoned that "a simple failure to administer the [*Miranda*] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," does not automatically "taint[] the investigatory process." *Id.* at 309. "[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second [i.e., the Mirandized] statement was also voluntarily made." *Id.* at 318 (footnote omitted). "[A] suspect who has once responded to

---

[3]The state conceded for the purposes of the appeal that the suspect was in custody at the time of this exchange. *See Elstad*, 470 U.S. at 315.

unwarned [i.e., un-Mirandized] yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.*

After *Elstad* came *Seibert*, upon which Mitchell relies. There, police questioning led to the defendant's confession to a crime, after which she was given a 20-minute break. *Seibert*, 542 U.S. at 604–05 (plurality opinion). Following the break, the officer turned on the tape recorder and only then gave the defendant her *Miranda* warnings. *Id.* at 605. When the defendant resisted making a statement, the officer reminded her that she had already admitted involvement in the crime; the defendant then confessed post-warning. *Id.* In a fractured decision, the Supreme Court held that the post-warning confession was inadmissible.

A four-justice plurality distinguished *Elstad* based on the following factors: "[1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615. On the facts of *Seibert*, the plurality determined, these factors dictated reversal "[b]ecause the question-first tactic effectively threatens to thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted, and because the facts here do not reasonably support a conclusion that the warnings given could have served their purpose." *Id*. at 617.

Justice Kennedy provided the fifth vote for reversal, writing separately to propose an alternative analysis:

> The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are *related to the substance* of prewarning statements must be excluded *unless* curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Alternatively,

an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient.

*Id.* at 622 (Kennedy, J., concurring) (emphases added). Four justices dissented, arguing that the post-warning confession was admissible. *See id.*

Thus, based on *Seibert*, there are two competing tests regarding how to evaluate the constitutionality of interrogations employing mid-stream *Miranda* warnings. As we noted in *United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015), "[b]ecause . . . the plurality and dissent [in *Seibert*] each received only four votes, . . . *Seibert* did not [itself] announce a binding rule of law." Therefore, reasonable jurists could read *Seibert* as having established only that on the facts of that case, the post-warning confession was inadmissible. *See Dixon*, 565 U.S. at 30–32 (citing both the plurality opinion and Justice Kennedy's opinion but not exclusively adopting the approach of either).

As mentioned above, the Michigan Supreme Court found no constitutional violation because Mitchell's pre-warning statement had denied involvement in the killing; thus, "[u]nlike in [*Seibert*], there is no concern here that police gave [defendant] *Miranda* warnings and then led him to repeat an earlier murder confession, because there was no earlier confession to repeat." *Mitchell*, 822 N.W.2d at 224 (third alteration in original) (quoting *Dixon*, 565 U.S. at 31). Mitchell argues that the Michigan Supreme Court took this quote from *Dixon*—a Supreme Court opinion discussing both *Elstad* and *Seibert*—out of context. Indeed, Mitchell relies heavily on *Dixon* to argue that (1) *Dixon* made clear that the absence of a pre-warning confession is not the end of the analysis and (2) the application of either the plurality's or the Kennedy concurrence's approach from *Seibert*, which led to the *Dixon* Court's finding a confession admissible, would produce the opposite result in Mitchell's case because his facts are much more like *Seibert*. An examination of *Dixon*, however, reveals that the Michigan Supreme Court was not unreasonable in determining that Mitchell's case was comparable in pertinent respects to *Dixon*.

In *Dixon*, both Dixon and another man murdered the victim. 565 U.S. at 24–25. Dixon then used the victim's social security card and birth certificate to obtain a state identification card in the victim's name so Dixon could sell the victim's car. *Id.* at 25. Police arrested Dixon on a forgery charge and then questioned him intermittently over several hours but intentionally

declined to provide Dixon with *Miranda* warnings. *Id.* Dixon admitted to forging the victim's signature, but he denied having any involvement in the victim's disappearance. *Id.* After Dixon's accomplice spoke to police officers and led them to where the two had buried the body, officers again brought Dixon to the station, about four hours after the initial intermittent questioning had concluded. *Id.* at 26. "Dixon stated that he had heard the police had found a body and asked whether [his accomplice] was in custody. The police told Dixon that [the accomplice] was not, at which point Dixon said, 'I talked to my attorney, and I want to tell you what happened.'" *Id.* After the officers advised him of his *Miranda* rights, Dixon admitted to murdering the victim. *Id.*

Ultimately, Dixon's case reached the Supreme Court in the form of an appeal from the denial of his § 2254 petition. The Court, citing both *Elstad* and *Seibert*, held:

> In this case, no two-step interrogation technique of the type that concerned the Court in *Seibert* undermined the *Miranda* warnings Dixon received. In *Seibert*, the suspect's first, unwarned interrogation left "little, if anything, of incriminating potential left unsaid," making it "unnatural" not to "repeat at the second stage what had been said before."

*Id.* at 31 (quoting *Seibert*, 542 U.S. at 616–17 (plurality opinion)). Accordingly, the Court continued:

> [A]dmission of Dixon's murder confession was consistent with this Court's precedents: Dixon received *Miranda* warnings before confessing to [the] murder; the effectiveness of those warnings was not impaired by the sort of "two-step interrogation technique" condemned in *Seibert*; and there is no evidence that any of Dixon's statements was the product of actual coercion.

*Id.* at 32.

Assuming Mitchell's version of the facts leading to his post-warning admissions is correct, reasonable jurists could find his case to be more like *Dixon* and *Elstad* than *Seibert*. As in *Dixon* and *Elstad*, here, there was no confession during the interrogations that occurred prior to the *Miranda* warnings. Instead, Mitchell received *Miranda* warnings before admitting to beating Jorden and taking money and drugs from him. Also, although Collins referenced Mitchell's pre-warning statements during the post-warning interrogation, there is no evidence

that Collins used Mitchell's earlier, un-Mirandized statements to coerce a post-warning confession or that Collins otherwise induced Mitchell to waive his rights.

It is true that Mitchell was given only a few minutes between his pre- and post-warning interrogations (unlike Dixon, who had four hours) and that Collins himself conducted both interrogations. *See Seibert*, 542 U.S. at 615 (plurality opinion) (One factor to consider in determining the effectiveness of mid-stream warnings is "the continuity of police personnel."). Also, during the unwarned interrogation, Mitchell told Collins about a prior incident with Jorden concerning the gun and admitted to being at the location of Jorden's shooting on the evening of the murder. However, in *Dixon*, the Supreme Court reaffirmed the holding in *Elstad* that "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second [warned] statement was also voluntarily made." *Dixon*, 565 U.S. at 29 (alteration in original) (quoting *Elstad*, 470 U.S. at 318); *see id.* at 30 n.3, 32. Similarly, here, Mitchell does not contend that any pre-warning statements he made, though technically in violation of *Miranda*, were involuntary. And none of those statements included a confession to the killing or to any crime, unlike in *Seibert*. To the extent that what Mitchell *did* say in his unwarned statements could be considered incriminating, indeed, *Dixon* indicates that incriminating statements falling short of a confession do not necessarily taint a post-warning confession. In *Dixon*, after all, the defendant readily admitted forgery during the unwarned interrogation, thus establishing a connection between himself and the victim. *See Dixon*, 565 U.S. at 29. Similarly, here, although Mitchell admitted being near the scene before Jorden's murder, he did not admit any wrongdoing during the unwarned interrogation.

Our task in applying AEDPA is not to consider in the first instance whether we would reach the same result as the state court but to determine whether the state court's application of clearly established federal law was unreasonable. *See Taylor*, 529 U.S. at 411. Here, where the Supreme Court has held in *Dixon* and *Elstad* that mid-stream warnings do not necessarily make a post-warning confession inadmissible, and *Seibert* did not establish a clear rule for determining when such confessions are inadmissible, the Michigan Supreme Court's determination that

Mitchell's post-warning admissions had not been elicited in violation of *Miranda* was reasonable.[4]

## V.  CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's denial of Mitchell's § 2254 petition.

---

[4]Mitchell also argues that the cumulative effect of the mid-stream *Miranda* warnings and Detective Collins's allegedly misleading statements resulted in Mitchell's being inadequately informed of his rights. However, because the COA did not include this "cumulative effects" issue, we are not required to entertain it. *See Dunham v. United States*, 486 F.3d 931, 934 (6th Cir. 2007).  Mitchell's reliance on *Gonzalez v. Thaler*, 565 U.S. 134 (2012) to argue that there is no bar to reaching this argument is unavailing.  Unlike in *Gonzalez*, where the COA was defective because it failed to comply with 28 U.S.C. § 2252(c)(3), *see* 565 U.S. at 141, the district court here issued a compliant COA.  It precisely identified the two issues certified for appeal and rejected the others.  In these circumstances, we address only the issues certified for appeal. *See Dunham*, 486 F.3d at 934.  Moreover, we decline to exercise our "inherent authority to expand sua sponte the scope of the COA to encompass additional issues." *See Howard v. United States*, 485 F. App'x 125, 127–28 (6th Cir. 2012).