NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0535n.06

No. 19-1782

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Sep 16, 2020 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MOHAMED MOHAMOUD ABDI, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

Before: SUHRHEINRICH, LARSEN, and READLER, Circuit Judges.

LARSEN, Circuit Judge. Following a string of armed robberies, a jury convicted Mohamed Abdi of nine Hobbs Act violations, *see* 18 U.S.C. § 1951(a), and eight counts of use of a firearm during and in relation to a crime of violence, *see* 18 U.S.C. § 924(c)(1)(A)(ii). The district court then sentenced Abdi to fifty-six years plus nine days in prison. On appeal, Abdi contends that a police transgression of his Fourth Amendment rights and multiple *Miranda* violations should have resulted in the suppression of evidence at his trial. In addition, Abdi argues that the district court erred in stacking the sentences for his eight § 924(c)(1)(A)(ii) convictions. For the reasons that follow, we AFFIRM.

I.

On October 18, 2017, an armed man robbed a CVS store on Mack Avenue in St. Clair Shores, Michigan. The robber displayed what appeared to be a gun in his waistband and demanded

that a CVS employee put money from multiple cash registers into a plastic CVS bag. After the robber left the store, the employee quickly called 911. When police arrived just a few minutes later, the employee recounted the events and described the robber as an African American man wearing a "green hat with an S on it." Police at the scene relayed the employee's description over a police radio.

At that time, Sergeant David Gardzella was on patrol about two miles south in neighboring Grosse Pointe Woods. Dispatch described the CVS robber over the radio as "a black male in his 30s wearing a Michigan State baseball cap" and driving a white Buick Rendezvous. Gardzella responded by driving northbound on Mack Avenue toward the CVS and soon saw a white Buick Rendezvous traveling southbound. As the vehicle passed, Gardzella "saw a black male inside with a green baseball cap" that he "associate[d] with Michigan State colors."

Gardzella quickly turned around, never lost sight of the vehicle, and followed the Buick Rendezvous into a small municipal parking lot. While Gardzella waited to receive more information from dispatch, he saw the driver—Mohamed Abdi, no longer wearing the green cap—get out of the Buick and begin to walk away. At that point, Gardzella opened his car door and ordered Abdi to stop and put his hands on his head. He told Abdi he was "going to have to check him out because he matched the description of a person in a robbery." Gardzella asked if that was "okay." Abdi agreed, and the sergeant patted him down for weapons. Over the next minute, Gardzella asked Abdi four questions: (1) his name, (2) where he was coming from, (3) where he was going, and (4) why he stopped in the parking lot. Abdi gave his name, and claimed he was coming from Roseville and going to the hospital. Abdi's answer to why he stopped in the parking lot cannot be heard on the recording, and Gardzella did not testify about his response.

In response to further questioning by Gardzella, Abdi made several incriminating statements. However, in accordance with the district court's later order, these subsequent statements were not introduced at trial. First, Abdi mentioned that there was a weapon in his car. Upon hearing this, Gardzella immediately ordered Abdi to turn around and drop his keys, and, while arresting Abdi, he asked why Abdi had a weapon in the car. Abdi replied that he had done "something stupid." Gardzella then asked Abdi if he had robbed the CVS store, and Abdi answered, "Yes." After arresting Abdi, Gardzella and other officers looked inside the Buick Rendezvous and found a green Michigan State baseball cap on the front passenger seat, as well as a handgun and a bag filled with money inside the center console.

Abdi was taken into the custody of the St. Clair Shores Police Department (SCSPD) and transported to the police station for processing and booking. Two SCSPD officers interviewed him at the station house. Before any questioning, the following exchange occurred:

> **Officer:** I got to read some things to you. These are your *Miranda* warnings. You have the right to remain silent. Anything you say can and will be used against you in the court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. You may decide at any time to exercise these rights and not answer any questions or make any statements. Did you understand each of these rights as I read them to you?
>
> **Abdi:** Yes, I do.
>
> **Officer:** Having these rights in mind, do you wish to talk to us now?
>
> **Abdi:** I . . . I will . . . Is there a lawyer around by chance right now?
>
> **Officer:** We don't have one here, no.
>
> **Abdi:** Okay, so if I was to request one how long would it take him to get here?
>
> **Officer:** You would have to get your own.
>
> **Abdi:** I would have to get my own? If I can't afford one?
>
> **Officer:** Then at court they would appoint one to you; the court would appoint one to you after your arraignment.
>
> **Abdi:** And then what would happen?
>
> **Officer:** Not sure yet.

After about an eight second pause, the officers explained to Abdi again, "We have to read you your rights and we have to let you know your rights," to which Abdi replied, "I know my rights. I know my rights." One of the officers asked Abdi if he wanted to continue with the interview or wait. Abdi responded, "I guess I can talk," but added that he would not answer every question. One of the officers replied, "That's up to you . . . . We can't . . . make you." Abdi then admitted to committing several robberies, including the robbery of the CVS on Mack Avenue.

Later that same day, Abdi was questioned a second time by two Federal Bureau of Investigation (FBI) agents about the string of robberies. The agents fully advised Abdi of his *Miranda* rights before any questioning, both orally and in writing. Abdi acknowledged his understanding and agreed to speak with the agents. He then confessed again to committing all nine robberies at issue. A federal grand jury charged Abdi with nine Hobbs Act violations for the robberies, as well as nine violations of 18 U.S.C. § 924(c)(1)(A)(ii) for his use of a firearm during and in relation to each of them.

Abdi filed a motion to suppress his confessions, which the district court granted in part and denied in part. It found that Gardzella should have advised Abdi of his *Miranda* rights after he "told Abdi to turn around and drop his keys, and certainly after Abdi stated that he did 'something stupid.'" The court suppressed Abdi's statements to Gardzella after that point. The court determined, however, that the *Miranda* warnings provided at the SCSPD prior to questioning were sufficient, that Abdi had voluntarily waived his *Miranda* rights, and that Abdi never unambiguously invoked his right to counsel. Similarly, the court found that Abdi's later statements to the FBI agents were made after he was again fully advised of his rights under *Miranda* and voluntarily waived those rights for a second time. As a result, it held Abdi's subsequent

confessions at the police station to both the SCSPD officers and the FBI agents were admissible. Only the confessions to the FBI agents were admitted at trial.

One week before trial—and more than four months past a pretrial motions deadline set by the district court—Abdi filed a motion to adjourn and for leave to file another motion to suppress evidence. He did not identify any new evidence, but proposed to argue that all of the government's evidence, including all of his statements and all physical evidence resulting from the stop by Gardzella, should be suppressed because Gardzella lacked reasonable suspicion to stop him in the parking lot. The district court granted Abdi's motion to adjourn, but denied leave to file another suppression motion, finding the motion was untimely without a showing of good cause and that, in any event, Gardzella had reasonable suspicion to stop Abdi.

Abdi's trial occurred over several days in November 2018, and the jury found him guilty of all nine of the robbery charges, as well as eight of the nine associated § 924(c)(1)(A)(ii) charges. The district court imposed consecutive sentences of one day on each robbery count, and seven years on each gun charge, for a total sentence of fifty-six years and nine days.

Abdi filed a timely notice of appeal. Before this court, he raises three issues: (1) whether Gardzella had reasonable suspicion to stop Abdi in the parking lot, such that all evidence obtained thereafter should have been suppressed; (2) whether his *Miranda* rights were violated, thereby rendering his confessions inadmissible; and (3) whether the district court properly "stacked" his eight § 924(c)(1)(A)(ii) convictions in issuing Abdi's sentence.

## II.

We address Abdi's Fourth Amendment challenge first. The Fourth Amendment protects the people only against "unreasonable . . . seizures." U.S. Const. amend. IV. Consistent with this right, it is well established that a police officer may briefly stop a suspect for investigation when

the "officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). An "inchoate and unparticularized suspicion or 'hunch'" is not enough to support reasonable suspicion. *Id.* at 27. Rather, to justify an investigatory *Terry* stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. Whether such "reasonable suspicion" exists is based on the "totality of the circumstances," including all the information and experience available to the police officer at the time of the stop. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

In this case, the claimed Fourth Amendment violation suffers both procedurally and on the merits. On the procedural front, Abdi filed his motion to suppress after the district court's pretrial motions deadline without good cause. "Only in a case of the most flagrant abuse will a court of appeals review a trial court's discretionary denial of a motion to suppress as untimely." *United States v. Francis*, 646 F.2d 251, 260 (6th Cir. 1981); *see United States v. Nicholson*, 716 F. App'x 400, 418 (6th Cir. 2017). And nothing of the sort is at work here. On April 9, 2018, the district court set June 11 as the deadline for filing pretrial motions. Abdi moved for leave to file his motion to suppress on Fourth Amendment grounds on October 31—more than four months late and only a week before trial. He offered no legitimate reason to the district court for that delay, arguing only that "an additional review of the record evidence" in light of the district court's *Miranda* ruling brought the issue "into a more precise and sharper focus." Such a decision to wait and "see how the court rule[s] on an earlier motion" before filing another one based on previously available evidence is not good cause for months of delay. *United States v. Walden*, 625 F.3d 961, 965 (6th Cir. 2010) (citing *United States v. Garcia*, 528 F.3d 481, 484–85 (7th Cir. 2008)). Nor does Abdi even challenge the district court's lack-of-good-cause finding on appeal. *See United States v.*

*Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006) ("An appellant abandons all issues not raised and argued in its initial brief on appeal." (citation omitted)).  These procedural failures alone provide ample justification for upholding the district court's ruling.

Even if Abdi could show good cause, we agree with the district court that Gardzella had reasonable suspicion to stop him.  Within minutes of the CVS robbery, police dispatch informed Gardzella that "a black male in his 30s wearing a Michigan State baseball cap" had robbed the CVS on Mack Avenue about two miles north of Gardzella and had driven away in a white Buick Rendezvous.  That information possessed adequate indicia of reliability, coming from an officer's in-person interview of a CVS employee who had just observed the suspect firsthand.  *See Adams v. Williams*, 407 U.S. 143, 146–47 (1972) (explaining that a *Terry* stop is justified "when the victim of a . . . crime seeks immediate police aid and gives a description of [her] assailant"); *see also Navarette v. California*, 572 U.S. 393, 398–399 (2014).[1]  In response, Gardzella began traveling northbound on Mack Avenue towards the CVS and soon saw a white Buick Rendezvous travelling southbound (i.e., from the direction where the robbery occurred).  As the white Buick Rendezvous passed him, Gardzella observed "a black male inside with a green baseball cap" that he "associate[d] with Michigan State colors."  This was all consistent with police dispatch's description of both the robber and getaway vehicle—one that was driving away from the scene of

---

[1] On this point, Abdi relies heavily on *Florida v. J.L.*, 529 U.S. 266, 270 (2000), arguing that "[a]s in *J.L.*, police suspicion that the suspect was dangerous arose not from observation, but solely on information from another source."  But the Supreme Court has squarely rejected Abdi's "argument that reasonable cause for a [*Terry* stop] can only be based on the officer's personal observation, rather than on information supplied by another person."  *Adams*, 407 U.S. at 147.  The key to *J.L.* was not that the officer's suspicion arose from another source, but that it arose "from a call made from an *unknown location by an unknown caller*."  529 U.S. at 270 (emphasis added).  And in concluding that such "an anonymous tip lacking indicia of reliability" could not justify a *Terry* stop, the Court distinguished "a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated."  *Id.* at 270, 274.  The latter is what we have here.

the crime just minutes after the robbery. Based on these observations, Gardzella turned around, never lost sight of the vehicle, and followed it into the parking lot.

Taken together, these specific and articulable facts justify the subsequent *Terry* stop. Indeed, in a similar case, we held that reasonable suspicion "clearly" existed on less. *See United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (finding reasonable suspicion where an officer saw a damaged vehicle matching the description of a suspected burglary getaway car, driving miles away from the scene a full twenty-five minutes later, even though the vehicle type and number of passengers inside did not match the description given to authorities). To be sure, Abdi got out of his car no longer wearing the green cap—which was found only later by Gardzella on the passenger's seat. But that alone does not defeat Gardzella's reasonable suspicion. After all, the officer had already seen Abdi wearing the green cap in the Rendezvous and never lost sight of the vehicle before Abdi emerged. Accordingly, the initial stop and frisk did not violate Abdi's Fourth Amendment rights.

III.

That brings us to Abdi's *Miranda* claims. Police officers are required to give *Miranda* warnings before questioning a suspect "only where there has been such a restriction on [his] freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam); *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "In determining whether a person is 'in custody' for purposes of *Miranda*, courts look to 'the objective circumstances of the interrogation to determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017) (alterations adopted) (quoting *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009)). "Not all restraints on freedom of movement amount to custody for purposes

of *Miranda*." *Howes v. Fields*, 565 U.S. 499, 509 (2012). Instead, the "relevant environment" must "present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*" before a violation can occur. *Id.* Even then, once *Miranda* warnings have been given, the defendant may still waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444.

Abdi claims two *Miranda* violations on appeal. First, he argues that he was "in custody and subject to interrogation the moment Sgt. Gardzella ordered him to stop walking and place his hands behind his head." Second, he maintains that he "never gave an effective waiver" before questioning at the police station. Neither claim has merit.

A.

We turn first to Abdi's statements to Gardzella in the parking lot. And we note at the outset that only Abdi's answers to Gardzella's first four questions—his name, where he was coming from, where he was headed, and why he stopped in the parking lot—were permitted at trial. Consistent with the district court's order, Abdi's later statements to Gardzella that he had a weapon in his car, had done "something stupid," and had robbed the CVS were all suppressed.

Like his Fourth Amendment argument, Abdi's first *Miranda* claim fails on both procedural and substantive grounds. It fails procedurally because Abdi has now flip-flopped on the argument he made to the district court. In his motion to suppress, Abdi conceded that during the "initial interaction," Gardzella "was permitted to ask questions, without providing *Miranda* warnings, relating to Defendant's identity and regarding the safety of the public as well as himself." Moreover, at the suppression hearing, Abdi's counsel reaffirmed that Gardzella's first four questions were permissible even absent *Miranda* warnings. *See* R. 86, PageID 847 ("[W]hat we're arguing here is that all statements . . . from the point of him being handcuffed through the rest of

the day be excluded."). But that is not Abdi's position on appeal. He now argues that he was in custody before any questioning—specifically, "the moment Sgt. Gardzella ordered him to stop walking and place his hands behind his head." That novel argument is improper. By conceding the legality of Gardzella's first four questions below, Abdi waived his opportunity to contest the matter in this court. *See United States v. Collins*, 683 F.3d 697, 701 (6th Cir. 2012).

In any event, Abdi fares no better on the merits. The Supreme Court has held that "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) (internal citation omitted). And this was nothing but an ordinary *Terry* stop. It involved "only one" police officer and occurred outside in "public view," where others could witness the interaction. *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984); *see United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003). Each of Gardzella's first four questions was non-accusatory, sought routine information familiar to any investigatory stop, and was posed in the first minute of the interaction. And, although Abdi "was not free to leave" during the stop and frisk, he "was not in handcuffs or in any other way restrained." *Swanson*, 341 F.3d at 530. At least for these four questions, then, Abdi was not in custody for *Miranda* purposes. The circumstances were "quite different from stationhouse interrogation" and "substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda*." *Berkemer*, 468 U.S. at 438–39. We therefore reject Abdi's first *Miranda* claim.

### B.

We also reject Abdi's second *Miranda* claim seeking to suppress his confession to the FBI. Abdi does not argue that the FBI agents themselves failed to properly *Mirandize* him. Instead, he

suggests that the "FBI agents' attempt to re-*Mirandize* Abdi w[as] ineffective," because "the taint from the prior interrogation by SCSPD was still present."

The problem with that argument is, there was no constitutional taint generated in the prior interrogation. Abdi waived his properly administered *Miranda* rights before confessing to the SCSPD officers. Nevertheless, Abdi urges us that the SCSPD officers "misled and deceived Abdi about his rights" so as to negate this waiver, and "also did not respect Abdi's invocation of the right to counsel." Both contentions are meritless.

1.

Start with Abdi's waiver. A voluntary, knowing, and intelligent waiver of a *Miranda* right "has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

There is no doubt that Abdi's decision to waive his privilege against self-incrimination was voluntary. "He alleges no 'coercion of a confession by physical violence or other deliberate means calculated to break [his] will,' and the trial court found none." *Colorado v. Spring*, 479 U.S. 564, 573–74 (1987) (alteration in original) (quoting *Oregon v. Elstad*, 470 U.S. 298, 312 (1985)). Nor was there any evidence that his "will [was] overborne and his capacity for self-determination critically impaired because of coercive police conduct." *Id.* at 574 (internal quotation mark omitted).

Furthermore, Abdi possessed the level of comprehension necessary to make his waiver knowing and intelligent. "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Id.* It simply requires "that the suspect be fully advised" of the privilege not to be a witness against himself. *Id.*; *see Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) ("The inquiry is simply whether the warnings reasonably conve[y] to [a suspect] his rights as required by *Miranda*." (alterations in original) (internal quotation mark omitted)).

Abdi claims that SCSPD officers "did not inform Abdi of his right to counsel *during interrogation*." But the SCSPD officers did just that, touching all the *Miranda* bases in no uncertain terms:

> I got to read some things to you. These are your *Miranda* warnings. You have the right to remain silent. Anything you say can and will be used against you in the court of law. *You have the right to talk to a lawyer and have him present with you while you are being questioned.* If you cannot afford to hire a lawyer, one will be appointed to represent you *before any questioning* if you wish. *You may decide at any time to exercise these rights and not answer any questions or make any statements.* Did you understand each of the rights as I read them to you?

Abdi responded affirmatively: "Yes, I do." He then said, "I will" talk.

To be sure, Abdi proceeded to ask some clarifying questions about the procedures for obtaining counsel. In response, the police informed him that there was no lawyer currently at the station, that he would need to get his own, but that if he could not afford one, "the court would appoint one to [him] after [his] arraignment." It is Abdi's position that "[w]hen the officer responded that he could only have a lawyer *at that moment* if he hired one, the officer intentionally dissuaded and confused Abdi about what his rights were."

We disagree. And on this point, *Duckworth* is controlling. There, after reading a recital of the *Miranda* rights similar to that issued in this case, the police added: "We have no way of

giving you a lawyer, but one will be appointed for you, if you wish, *if and when you go to court*." *Duckworth*, 492 U.S. at 198 (some emphasis omitted). Though that statement arguably "was linked [to a] future point in time *after* the police interrogation," *id.* at 204 (alteration in original) (quoting *California v. Prysock*, 453 U.S. 355, 360 (1981)), the Supreme Court found it unobjectionable because the defendant was otherwise apprised of his right to counsel before and during questioning. *See id.* at 203–04. The present case demands the same result. As in *Duckworth*, the officers "accurately described [Michigan's] procedure for the appointment of counsel" in response to Abdi's questions. *Id.* at 204; *see* MCR 6.005(A)–(D) (providing for the appointment of counsel at arraignment). And as in *Duckworth*, the *Miranda* warnings "did not suffer from [the] defect" of failing to "apprise the accused of his right to have an attorney present if he chose to answer questions." 492 U.S. at 205. The warnings properly informed Abdi that he had a right to counsel "before" any questioning and that he could exercise this right "at any time." *Id.*; *see Richardson v. Duckworth*, 834 F.2d 1366, 1371 (7th Cir. 1987) (rejecting the defendant's *Miranda* claim when he "was told, in response to his question about an attorney, that a lawyer would be appointed in court"); *People v. Smith*, 150 P.3d 1224, 1240 (Cal. 2007) (similar).

Thus, the responses to Abdi's clarifying questions did not negate the proper warnings given just seconds earlier. The responses correctly "indicated *when* counsel would be *appointed*, but [they] did not imply that the *right* to an attorney was tied to a future event." *Mitchell v. MacLaren*, 933 F.3d 526, 533 (6th Cir. 2019). When taken "in their totality," then, the police officers' explanations of Abdi's rights satisfied *Miranda*. *Duckworth*, 492 U.S. at 205. "*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one." *Id.* at 204. In this case, the police "reasonably conveyed

[Abdi]'s right to have an attorney present, not only at the outset of interrogation, but at all times." *Florida v. Powell*, 559 U.S. 50, 62 (2010).

Moreover, when one of the officers followed up again stating, "We have to read you your rights and we have to let you know your rights," Abdi reaffirmed, "I know my rights. I know my rights." When one of the officers asked Abdi if he wanted to continue with the interview or wait, Abdi responded, "I guess I can talk," but added that he would not answer every question. The officer confirmed that he wouldn't have to: "That's up to you . . . . We can't . . . make you." Abdi nevertheless proceeded to confess.

We have no trouble concluding that this was the product of a voluntary and intelligent waiver. After police read Abdi a proper set of *Miranda* warnings, he affirmed that he understood his rights—twice. And he also said he would refuse to answer certain questions. "[I]t is difficult to say that [Abdi] was not aware of his right to remain silent and the consequences of waiving that right when" he said he would "selectively decline[] to answer certain questions." *United States v. Crumpton*, 824 F.3d 593, 608 (6th Cir. 2016). And, in case there was still any doubt as to Abdi's understanding, the officers confirmed yet again that he did not have to answer their questions before proceeding.

Finally, Abdi insists that his status as a "foreigner" and "immigrant whose first language is not English" should give us pause. But when we look at the full picture, these facts have little, if any, bearing on the voluntariness of his *Miranda* waiver. Abdi moved to the United States at nine years old—a full 23 years before the interrogation—and is now a United States citizen. He graduated from high school in the United States. In fact, at the beginning of the SCSPD interview, he confirmed for the officers that he can "read and write" and "understand English." And a review of his various conversations in the record dispels any notion that Abdi struggles with the English

language. We have no hesitation in dismissing Abdi's suggestion that any lack of facility with English could have compromised his waiver.

2.

Abdi next argues that his request for counsel was ignored. But that is not so. Abdi never invoked his right to an attorney in the first place.

A suspect who requests counsel during an interview with police "is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 458 (1994). However, for this right to kick in, a "suspect must *unambiguously* request counsel." *Id.* at 459 (emphasis added). We have recognized that this limitation presents a "high bar" to affording relief. *United States v. Potter*, 927 F.3d 446, 450 (6th Cir. 2019). The police need not cease questioning "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Davis*, 512 U.S. at 459. "The mere mention of an attorney does not cut it. Nor does a question about having an attorney." *Potter*, 927 F.3d at 451 (internal citation omitted). A more direct request for counsel is required.

Abdi's statements were equivocal at best. He never asked for an attorney or requested that questioning stop until he had an opportunity to consult one. He only asked, "Is there a lawyer around by chance right now?" and then proceeded to inquire about the procedures "*if* [he] was to request one" and "*If* [he] can't afford one[.]" That equivocation falls well short of an invocation. *See Potter*, 927 F.3d at 451 (collecting cases). Indeed, after police told him a second time, "We have to read you your rights and we have to let you know your rights," Abdi replied, "I know my rights. I know my rights." Without mentioning counsel, Abdi then agreed to talk. Under these circumstances, there was no unambiguous invocation of the right to counsel.

In short, there were no constitutional violations in the SCSPD interrogation. As a result, there was nothing to taint the FBI's subsequent interview, during which Abdi was reread his *Miranda* rights and waived them once again. His confessions to the FBI were properly admitted.

IV.

On to the alleged sentencing error. Abdi argues that, because he has no prior criminal record, the First Step Act prevented the court from imposing consecutive seven-year sentences for each of his eight § 924(c)(1)(A)(ii) convictions. That is incorrect.

Two provisions of the Armed Career Criminal Act (ACCA) are relevant to this issue. First, except when a greater sentence is required, 18 U.S.C. § 924(c)(1)(A)(ii) imposes a mandatory minimum sentence of seven years for anyone convicted of "brandish[ing]" a firearm "during and in relation to any crime of violence." Second, for a defendant like Abdi convicted of multiple such violations, the mandatory minimum sentences are to be stacked, such that they must run consecutively. *See id.* § 924(c)(1)(D)(ii). That is exactly what the district court did in imposing Abdi's sentence.

The First Step Act did not touch either of these provisions. It "does not change the mandatory-minimum sentences for defendants convicted of possessing, brandishing, or discharging a firearm during a crime of violence." *United States v. Richardson*, 948 F.3d 733, 744–745 (6th Cir. 2020). And it does not change that a multicount offender like Abdi is to "receive a seven-year sentence for the first count under § 924(c) and seven-year sentences—also to run consecutively—for each of the . . . other counts." *Id.* at 745.

Instead, the First Step Act amended a different provision—§ 924(c)(1)(C)—to limit when courts must impose an enhanced *25-year* mandatory minimum based on a defendant's prior ACCA convictions. *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5221–22. That

provision has no application to the case before us. Indeed, § 924(c)(1)(C)—both before and after the First Step Act amendment—makes no mention at all of whether the sentences for multiple ACCA convictions are to run consecutively.

Relying on snippets of decontextualized legislative history and policy arguments, Abdi contends that Congress's amendment to § 924(c)(1)(C) was silently "intended to prevent the stacking of sentences." But not only is that reading squarely foreclosed by our precedent, *see Richardson*, 948 F.3d at 745, it wholly ignores and contradicts the plain text of the subsection that actually addresses how sentences are to run, *see* 18 U.S.C. § 924(c)(1)(D)(ii) ("no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person"). We "must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). When "the words of a statute are unambiguous," as here, the "'judicial inquiry is complete.'" *Id.* at 254 (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)). The district court properly sentenced Abdi.

\* \* \*

For the foregoing reasons, we AFFIRM the judgment of the district court.